Carol A. ANTHONY et al.

v.

The COMMONWEALTH OF MASSACHUSETTS et al.

Helen B. FEENEY

v.

The COMMONWEALTH OF MASSACHUSETTS et al.

Civ. A. Nos. 74–5061–T, 75–1991–T.

United States District Court, D. Massachusetts.

March 29, 1976.

Ropes & Gray, Thomas G. Digman, Jr., Richard P. Ward, John Reinstein, Boston, Mass., for plaintiffs.

Alan K. Posner, Asst. Atty. Gen., Boston, Mass., for defendants.

John J. Curtin, Jr., John F. Adkins, Bingham, Dana & Gould, Boston, Mass., for American Legion.

Albert E. Salt, intervenor, pro se.

Before CAMPBELL, Circuit Judge, and MURRAY and TAURO, District Judges.

## OPINION

TAURO, District Judge.

These two actions are brought under 42 U.S.C. § 1983 by four female Massachusetts residents who claim they failed to receive Civil Service appointments with the Commonwealth due to the operation of the Massachusetts Veterans' Preference Statute,[1] Mass.Gen.Laws ch. 31, § 23, which they claim unconstitutionally discriminates against them because of their sex. They now seek to permanently enjoin the continued enforcement of § 23.

■ Temporary restraining orders, consented to by all parties, were entered in each case by a single judge of this court prohibiting the defendants[2] from making,

---

1. *See* Appendix.

2. Named as defendants in each case are the Commonwealth of Massachusetts; The Division of Civil Service of the Commonwealth of Massachusetts; Edward W. Powers, individually and in his capacity as the Director of Civil Service; Nancy B. Beecher, Wayne A. Healy and Helen C. Mitchell, individually and as members of the Massachusetts Civil Service Commission.

As the defendants correctly point out, neither the Commonwealth of Massachusetts nor the

Division of Civil Service are "persons" within the meaning of § 1983 and, therefore, are not proper parties to any lawsuit brought under that section. *Gay Students Organization of University of New Hampshire v. Bonner*, 509 F.2d 652 (1st Cir. 1974). *See Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Nor have the parties stipulated to any facts which would permit the inference that $10,000 or more is

or preparing to make, recommendations for positions sought by the plaintiffs pending the outcome of this litigation. *See* 28 U.S.C. § 2284(3). The parties in both actions submitted agreed statements of fact. The cases were consolidated for argument and then submitted for a decision on the merits.

I

The Massachusetts Civil Service System covers approximately 60% of those employed by the Commonwealth. In the Classified Official Service, the division which includes the positions sought by the plaintiffs, 47,005 appointments (not including promotions) were made during the ten year period between July 1, 1963 through June 30, 1973. Forty-three percent (20,211) of those appointees were women while 57% (26,794) were men. Of the women appointees, 1.8% (374) were veterans, while 54% of the men (14,476) had veteran status.

This overall 57–43 ratio of men to women in the Official Civil Service does not tell the whole story, however. A large percentage of female appointees serve in lower grade permanent positions for which males traditionally have not applied. Some females obtained civil service appointments through a now-defunct practice by which appointing authorities requested only female applicants for particular jobs from the Civil Service Division. Other females have been appointed from lists which did not include many veterans. Agreed Statements of Facts in *Anthony v. Commonwealth* [hereinafter Anthony Statement] ¶ 21; Agreed Statement of Facts in *Feeney v. Commonwealth* [hereinafter Feeney Statement] ¶ 20.

Employment security is an attractive feature of a permanent civil service appointment. An appointee chosen for such a position, who successfully completes a six-month probationary period, receives essentially permanent tenure. Mass.Gen.Laws ch. 31, § 20D. Such appointee cannot be discharged except for cause, and is statutorily entitled to a hearing at which the basis for dismissal may be challenged. Mass.Gen. Laws ch. 31, § 43.

The first step toward obtaining a permanent civil service appointment is the taking of an examination administered by the Civil Service Division. The examination is designed to measure an applicant's relative ability and fitness for the particular position he seeks. For certain positions an "unassembled examination" is administered, consisting merely of assigned scores based upon an applicant's training and experience. For other positions, an applicant is required to take a written test, the results of which will serve as one element in a composite score reflecting an evaluation of the applicant's training and experience.

Once an applicant passes the examination, he becomes an "eligible" and is placed on an "eligible list." Those on the eligible list are then ranked as follows under a formula which is the basis for plaintiffs' complaint:

1. Disabled veterans in order of their composite scores.

2. Other veterans in order of their composite scores.

3. Widows and widowed mothers of veterans in order of their composite scores.

4. All other eligibles in order of their composite scores.

Mass.Gen.Laws ch. 31, § 23.

The Veterans' Preference provided in § 23 is, therefore, an integral part of the selection process. Although a veteran must achieve a passing test grade, an eligible non-veteran can never be placed ahead of a veteran, regardless of how superior his test score might be. As a practical matter,

---

involved in any of the plaintiffs' claims, thereby allowing them to be maintained under 28 U.S.C. § 1331. The actions against those two defendants must therefore be dismissed.

We do not reach the question of whether the Eleventh Amendment also bars actions of this type from being maintained against the Commonwealth of Massachusetts or the Division of Civil Service. *See Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

therefore, the Veterans' Preference re-. places testing as the criterion for determining which eligibles will be placed at the top of the list.[3]

Whenever a state agency needs to fill a Civil Service vacancy, it notifies the Civil Service Division. The Civil Service Director then "certifies" several candidates for appointment from the top of the appropriate eligible list, in ratios set forth in various administrative regulations, by sending those names to the appointing authority. In most instances, more names are certified for appointment than there are vacancies in order to give the appointing authority a measure of discretion in the actual hiring decision. The appointing authority is required to make the appointment from among the names so certified, but is not required to appoint the person highest on the list. Feeney Statement ¶ 9.

A full eligible list remains in effect for a maximum of two years, except when no eligibles remain available for appointment before the expiration of that period, or when a new examination is given for a position during the two year effective period of an eligible list. In the latter instance, the remaining eligibles on the prior list are integrated into the new list in order of their composite scores within each preference category. All eligibles who have attained a particular composite score within a preference category must be included among the eligibles certified for appointment. For example, should the Director, in accordance with a given regulation, certify that the five highest scores were 95 to 99, there might well be a number of eligibles who scored within that range. All would be certified.

**3.** As noted, within the category of veterans, the statute provides an additional preference for disabled veterans and within the category of non-veterans, the statute provides a preference for widows and mothers of veterans. The parties have not submitted data on the number of individuals who come within these two sub-categories, nor does it appear that their presence has any impact on the plaintiffs' basic contentions. *But see Hutcheson v. Director of Civil Service*, 361 Mass. 480, 281 N.E.2d 53 (1972).

## II

This Civil Service appointment scheme, subject as it is to the Veterans' Preference formula, is affected in its practical impact by a number of federal statutes and regulations which have limited sharply the opportunity for women to serve in the armed forces. Indeed, the percentage of females in the Official Civil Service who are also veterans (1.8%), is a reflection of the fact that, during most of the post-World War II period, no more than 2% of the armed forces personnel could be women. *See, e. g.*, 32 C.F.R. § 580.4(b). It is not surprising, therefore, that, currently only 2% of Massachusetts veterans are women. Feeney Statement ¶ 31.

Historically, women were excluded from the military until 1918 when approximately 10,000 were allowed to enlist in the Navy. After World War I, these volunteer groups were disbanded. Thereafter, until 1942, only nurses were allowed to enlist. Feeney Statement ¶ 35. From 1948 until 1967, women were prohibited from making up more than 2% of total personnel in the armed forces.[4] The Army, the largest branch of the nation's armed services, still maintains a 2% limitation by regulation. 32 C.F.R. § 580.4(b).

Apart from these absolute limitations, various enlistment and appointment criteria have, until recently, been more stringent for women than for men. A man may enlist at age 17. But, until 1967, women were statutorily barred until age 18. 10 U.S.C. § 505 *as amended* by Act of May 24, 1974, Pub.L. No. 93–290 § 1, 88 Stat. 173; Joint Anthony/Feeney Exhibits 100–04 [hereinafter J. Exhs.]. Parental consent was required of women under 21. For men,

**4.** 10 U.S.C. § 3209, *repealed by* Act of November 8, 1967, Pub.L. No. 90–130, § 1(9)(E), 81 Stat. 375; 10 U.S.C. § 3215, *repealed by* Act of November 8, 1967, Pub.L. No. 90–130, § 1(9)(H), 81 Stat. 375; 10 U.S.C. § 5410, *repealed by* Act of November 8, 1967, Pub.L. No. 90–130, § 1(16), 81 Stat. 376; 10 U.S.C. § 8208, *repealed by* Act of November 8, 1967, Pub.L. No. 90–130, § 1(26)(C), 81 Stat. 382; 10 U.S.C. § 8215, *repealed by* Act of November 8, 1967, Pub.L. No. 90–130, § 1(26)(E), (F), 81 Stat. 382.

the age was 18. Feeney Statement ¶ 38. Moreover, women seeking enlistment have been subject to higher mental aptitude test score requirements and more rigorous physical requirements than men, as well as more extensive application and screening procedures, including requirements for personal references and attractive appearance. J. Exhs. 93, p. 14, 99, 100–04, 107–10, 123, 154. Until recently, the armed services prohibited the enlistment and appointment of married women and women with children less than 18 years of age, while similarly situated men were not so excluded. Feeney Statement ¶ 38; J. Exhs. 98, 99, p. 2, 103, 104. And, of course, women have always been ineligible for the draft.

Nothing in the Massachusetts scheme prohibits women from competing for civil service positions. But the practical consequence of the operation of these federal military proscriptions, in combination with the Veterans' Preference formula is inescapable. Few women will ever become veterans so as to qualify for the preference; and so, few, if any, women will ever achieve a top position on a civil service eligibility list, for other than positions traditionally held by women.

The plaintiffs contend that this consequence has effectively deprived them of an opportunity to compete for the most attractive positions in the state civil service. They maintain that such an absolute and permanent negative impact on the opportunities of women to obtain significant public employment consistent with their qualifications violates the equal protection clause of the Fourteenth Amendment. It is to these specific contentions that we now turn.

### III

#### A.

#### The *Anthony* Case

The plaintiff Carol A. Anthony, is a female resident of Massachusetts, admitted to practice law here. She is a provisional appointee to a counsel position in the Massachusetts Department of Public Welfare. On January 9, 1974, she applied to take an announced unassembled examination for appointment to the permanent position of Counsel I. Her qualifications were rated in May 1974 and Ms. Anthony received a grade of 94, which tied her for the highest score received by any applicant. But, when the eligible list of applicants was established on October 25, 1974, Ms. Anthony, a non-veteran, was not ranked at the top of the list. Instead, she was ranked 57th behind 56 veterans, all of whom were men and 54 of whom had lower scores than she on the examination. Since new applications were continuously accepted and processed, Ms. Anthony claims that the names of 20 additional veterans who applied for the positions after she did (all of whom were men and 19 of whom received lower scores) were then integrated into the list ahead of her, reducing her eventual position on the list to 77th.

The parties have stipulated that, but for the restraining order entered in the *Anthony* case on November 4, 1974, the defendants would have begun the certification process, and that Ms. Anthony would not have been certified for any of the 19 permanent Counsel I positions which had by that time been requisitioned. Anthony Statement ¶ 15. Given her position on the list, defendants concede that it is unlikely that Ms. Anthony would have been reached for certification for any subsequent counsel vacancy.

If, on the other hand, the Counsel I list had been established by ranking eligibles in the order of their examination grades, without application of the Veterans' Preference formula, Ms. Anthony would have been among the first considered for appointment to permanent Counsel I positions. Solely because of defendants' application of the Veterans' Preference Statute, therefore, Ms. Anthony's position on the list was reduced from a tie for first place to at least 57th. She claims she was thereby effectively deprived of an equal opportunity to be considered for appointment to a permanent Counsel I position. Anthony Statement ¶¶ 9–13, 15, 16, 29; Feeney Statement ¶¶ 9–

18; Anthony Exhs. 2, 3, 81; Feeney Exhs. 9, 11; Appendix A.

Plaintiff Kathryn Noonan is also a female resident of Massachusetts, admitted to practice law here. In early 1974, Ms. Noonan applied for a counsel position at the Labor Relations Commission. She was informed by its Chairman that a state-wide examination for the position was imminent and that, as a result of the Veterans' Preference Statute, her status as a non-veteran gave her little chance of being considered for permanent appointment to the position. Moreover, any interim, provisional appointment as a counsel which she might receive would be terminated after the certification of a veteran. Ms. Noonan was instead offered, and accepted, a provisional appointment to the position of Labor Relations Examiner with the Labor Relations Commission since no state-wide examination for that position was pending. Although she assumed the duties and responsibilities of a counsel, she had the title of an examiner and received the pay for that position which is of a lower grade and pay than a Counsel I position.

Ms. Noonan, however, also took the Counsel I unassembled examination in May 1974. She eventually received a grade of 94, which was the highest grade received by any applicant. Like Ms. Anthony, Ms. Noonan was not ranked at the top of the eligible list for the Counsel I position, but was instead ranked with Ms. Anthony behind at least 56 veterans, all of whom were men and 54 of whom received lower grades on the examination.

But for the entry of the restraining order, the parties agree that Ms. Noonan, like Ms. Anthony, would not have been certified for any of the 19 Counsel I positions then available and would not have been considered for any Counsel I position. If, on the other hand, the Counsel I list had been established by ranking eligibles in the order of their examination grades, without application of the Veterans' Preference formula, Ms. Noonan would have been certified and placed among the first group considered for appointment to permanent Counsel I posi-

tions. Indeed, she was told by the Chairman of the State Labor Relations Commission in late 1974 that she would have been recommended for such an appointment. Ms. Noonan's position on the list was substantially reduced, and she was deprived of these opportunities for appointment to a Counsel I position in 1974, solely because of defendants' application of the Veterans' Preference Statute. Anthony Statement ¶¶ 9–14, 15–17, 29; Feeney Statement ¶¶ 9–18; Anthony Exhs. 2, 3, 82, 84; Feeney Exhs. 9, 11; Appendix A.

The plaintiff Betty A. Gittes is a female resident of the Commonwealth and maintains a private law practice here. She is not a veteran. In early 1974, Ms. Gittes applied for a permanent appointment to a Counsel I position. She received a grade of 92 on the unassembled examination, which tied her for the second highest score received by any applicant. Instead of being ranked near the top of the eligible list by virtue of her examination grade, however, Ms. Gittes was ranked 103rd, behind, among others, 76 veterans, all of whom were men and 64 of whom received lower grades on the examination than she. Like her co-plaintiffs, Ms. Gittes would not have been certified for any of the 19 Counsel I positions which were available and would not have been considered for any Counsel I position. Had the list been established by ranking eligibles in order of their examination grades and without application of the Veterans' Preference Statute, however, Ms. Gittes would have been among the first group of people considered for appointment to permanent Counsel I positions. Anthony Statement ¶¶ 9–13, 15, 16, 29; Feeney Statement ¶¶ 9, 18; Anthony Exhs. 2, 3, 83; Feeney Exhs. 9, 11; Appendix A.

### B.

#### The *Feeney* Case

The plaintiff Helen B. Feeney is a female resident of the Commonwealth, and is not a veteran. She has been a long-time employee of the Commonwealth, having served in the Civil Defense Agency from 1963 to 1967 as a Senior Clerk Stenographer and from

1967 to 1975 as Federal Funds and Personnel Coordinator.

Mrs. Feeney's experience with Civil Service examinations has been extensive. On February 6, 1971, she took an examination for the single position of Assistant Secretary, Board of Dental Examiners. Although she received the second highest grade of 86.68 on the examination, the application of the Veterans' Preference formula caused her to be ranked sixth on the list behind five veterans, all of whom were male and four of whom received lower grades. She was not certified and a male veteran with an examination grade of 78.08 was appointed.

On February 24, 1973, Mrs. Feeney took an examination for the single position of Head Administrative Assistant, Solomon Mental Health Center. Although she received a grade of 92.32, which was the third highest grade on the examination, the application of the Veterans' Preference formula caused her to be ranked 14th on the list behind 12 veterans, all of whom were men and 11 of whom had lower examination grades than she. But for the application of the Veterans' Preference, Mrs. Feeney would have been certified as eligible for the position. Instead, she was not certified.

On or about May 18, 1974, Mrs. Feeney took an examination for positions classified as Administrative Assistant. Although she received an examination grade of 87, which would have tied her for 17th place on the list, the Veterans' Preference formula caused her to be ranked 70th behind 64 veterans, 63 of whom were men and 50 of whom had lower examination grades. Although no appointments to any of the seven positions requisitioned from this list (or to

any of the 36 other positions now filled by provisionals) have yet been made because of this court's outstanding temporary restraining order, Mrs. Feeney's opportunity to be considered for appointment to any of these positions has been substantially diminished because of the application of the Veterans' Preference formula. Anthony Statement ¶¶ 9, 18, 19; Feeney Statement ¶¶ 10, 17, 27; Anthony Exhs. 5, 8; Feeney Exhs. 2, 4, 7, 61, 82; Appendices B, C.

On March 28, 1975, Mrs. Feeney was laid off from her position with the Commonwealth's Civil Defense Agency and has since been unemployed. Feeney Exhibit 82.

### IV

A threshold legal question is whether there remains a live controversy between the plaintiffs in the *Anthony* case and the defendants named in that action.

On April 17, 1975, the Massachusetts legislature enacted ch. 134 of the Acts of 1975, amending Mass.Gen.Laws ch. 31, § 5.[5] The amendment, which became effective on July 16, 1975, removed all appointments for state and municipal legal positions made after its effective date from the provisions of the state civil service law. Thus, the positions sought by the three plaintiffs in the *Anthony* case are no longer subject to the Veterans' Preference. Accordingly, the defendants now claim that the *Anthony* case is moot.

Although the *Anthony* plaintiffs did present a justiciable claim at the outset of the litigation, the "case or controversy" limitation of Article III requires "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d

---

**5.** Mass.Gen.Laws ch. 31, § 5 now provides:
　　No rule made by the [Civil Service] commission shall apply to the selection or appointment of any of the following:

　　．　　．　　．　　．　　．

　　counsels, attorneys-at-law, including *attorneys designated as counsel or counsellors-at-law, city solicitors, assistant solicitors, town counsels and assistant town counsels* (new language emphasized).

Section 2 of the 1975 amending statute then provides:
　　SECTION 2. The provisions of section five of chapter thirty-one of the General Laws, as amended by section one of this act, shall not impair the civil service status of any person holding employment on a permanent basis on the effective date of this act.

272, 277 (1975), *quoting Steffel v. Thompson*, 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505, 515 (1974). *See DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *Britt v. McKenney*, 529 F.2d 44 (1st Cir. 1976); *Marchand v. Director, U. S. Probation Office*, 421 F.2d 331, 332 (1st Cir. 1970). The doctrine of mootness is designed to shield the federal courts from rendering advisory opinions on what the law should be, or being drawn into disputes not affecting the rights of the litigants who are before them. *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413, 415 (1971). *Cf. Warth v. Seldin*, 422 U.S. 490, 499 n. 10, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 355 (1975). The question in each case, therefore, is whether there is a substantial controversy between parties of sufficient immediacy and reality which would allow a court to grant specific relief through a decree of conclusive character. *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617, 621 (1937). In the *Anthony* case, this question must be answered in the negative.

■ In 1974, when this action was originally brought, the likelihood of the *Anthony* plaintiffs obtaining appointment to Counsel I, or any legal position covered by Civil Service, was unquestionably affected by the Veterans' Preference. Even though the *Anthony* plaintiffs had all received high scores on the unassembled examination they were faced with a situation where veterans with lower scores would have preceded them on any certification list. Before the Director of Civil Service established a certification list for Counsel I positions, however, this court entered a temporary restraining order prohibiting him from either establishing an eligible list for Counsel I or making any certification of persons qualified for those positions to the appointing agencies. That action prevented any harm to the plaintiffs from the operation of the Veterans' Preference between the time they took the exam and the effective date of ch. 134.

Now, with Civil Service requirements no longer applicable to these counsel positions, appointing authorities are free to consider the plaintiffs without regard to the Veterans' Preference formula. Accordingly, the relief which the *Anthony* plaintiffs ultimately sought in the courts has now been accorded them through legislation, thereby resolving their underlying complaint.

But the plaintiffs oppose a conclusion of mootness, claiming they were injured by the very compilation of an eligible list in October 1974, on which they were ranked too low even to be certified to an appointing agency, and that the effects of that original injury remain. If the selection process operated as they allege it should have, and the Veterans' Preference did not distort the ranking of eligibles, they maintain they undoubtedly would have been certified and *chosen* for permanent positions by now. Accordingly, they argue that their rights can only be restored by an order requiring that they be considered for appointment now, as they should have been considered late in 1974, and, if they are appointed and successfully complete their probationary periods, that they hold their positions with all the protections of the Civil Service Laws as if appointed in late 1974.

■ This argument misconstrues the operation of the civil service selection process. A high score on the civil service exam, and resulting certification to an appointing agency, is not and never has been a guarantee of selection. Had there been no Veterans' Preference when the Counsel I eligible list was compiled in 1974, the *Anthony* plaintiffs were assured only of being *considered* for the various vacancies which arose while the list remained in force. The only cognizable injury the *Anthony* plaintiffs suffered by virtue of the Veterans' Preference was being removed from consideration for Counsel I positions. The enactment of ch. 134 now restores precisely that opportunity to them. Their claim for seniority rights dating back to 1974, therefore, is too speculative to breathe life into an otherwise dead issue between the par-

ties. *Cf. Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

To be sure, a Counsel I position today has a slightly different job description than it had in October 1974. Removal of the position from civil service protection means that individuals now appointed do not have "tenure" or the statutory right to a hearing upon discharge. Anyone appointed as a Counsel I, therefore, is subject to a risk not present in October 1974.

■ The *likelihood* of future injury may, on occasion, serve as a basis for allowing a claim to be maintained even though it may appear at first blush to be moot. *See Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974); *Roe v. Wade*, 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147, 161 (1973); *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). But, in this case, any future loss due to the removal of civil service protection, amounts to the *possible* loss of tenure and hearing rights in the event of dismissal. This claim is, at most, incidental to the plaintiffs' attack on the Veterans' Preference and its effect on the initial selection process. Moreover, even if it were somehow related to the plaintiffs' complaint, the potential injury resulting from the loss of civil service protection depends upon the occurrence of a chain of events—the plaintiffs' obtaining permanent civil service status, their being discharged and being deprived of a hearing—which are wholly speculative and now so remote that they do not present any tangible prejudice to any existing interests the plaintiffs may have. *See Preiser v. Newkirk*, 422 U.S. 395, 402–03, 95 S.Ct. 2330, 2334–35, 45 L.Ed.2d 272, 278–279 (1975); *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413, 415 (1971); *Hall v. Beals*, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969). *Cf. O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

■ The *Anthony* plaintiffs also claim there is still a likelihood of future harm because they remain interested in non-legal civil service positions which are still covered by the civil service law. Yet, prior to the adoption of ch. 134, the *Anthony* plaintiffs had never clearly indicated such an interest and, indeed, had specifically directed their challenge to the effect of the Veterans' Preference on their opportunities to be considered for Counsel I positions. Moreover, the record does not indicate that they have applied for any other jobs, that they are qualified to hold any other civil service positions, or that the selection process for those positions is affected to the same degree as it allegedly is for the positions they originally sought. To allow the *Anthony* plaintiffs to shift the focus of this case now, and maintain an action because there exists the possibility that they may someday apply for other civil service positions, and might in such an event be deprived of fair consideration because of the operation of the Veterans' Preference; would require us to deal with a controversy which simply does not and may never exist. This we decline to do.

■ Finally, the *Anthony* plaintiffs maintain that since they have each claimed damages of one dollar their action is still alive. This claim is without merit. Where courts proceed to hear otherwise moot cases because of a claim for damages, that claim is invariably a substantial one, *see, e. g., Stanton v. Stanton*, 421 U.S. 7, 11, 95 S.Ct. 1373, 1376, 43 L.Ed.2d 688, 693 (1975), hotly contested by the parties. *Powell v. McCormack*, 395 U.S. 486, 497–98, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491, 502–03 (1969). In this case, the plaintiffs made no claim for damages until the enactment of ch. 134, and they concede that the prayer is only a nominal one. Under these circumstances, the damage claim is clearly incidental to the relief sought and, therefore, cannot properly be the basis upon which the court could find the *Anthony* claim justiciable. *Kerrigan v. Boucher*, 450 F.2d 487, 489–90 (2d Cir. 1971).[6]

---

**6.** The *Anthony* plaintiffs do not claim that the legislature is likely to reverse its decision to

voluntarily remove Counsel I positions from the requirements of civil service, *see, e. g.,*

Accordingly, this court holds that the claims brought by the three plaintiffs in the Anthony case are now moot. We therefore proceed to the merits of the Feeney case alone.

V

■ A state cannot, without justification, classify its citizens by imposing unequal burdens or awards on otherwise equally situated individuals. In cases involving alleged sex discrimination, the majority position on the Supreme Court would seem to permit a classification based on sex only as long as it was founded on a "convincing factual rationale" which goes beyond "archaic and overbroad generalizations" about the roles of men and women. *Fortin v. Darlington Little League, Inc.,* 514 F.2d 344 (1st Cir. 1975). *See Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974); *Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974); *Frontiero v. Richardson,* 411

U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).[7]

The Massachusetts Veterans' Preference was not enacted for the purpose of disqualifying women from receiving civil service appointments. Theoretically, women are not barred from qualifying as preferred veterans. Yet, the formula's impact, triggered by decades of restrictive federal enlistment regulations, makes the operation of the Veterans' Preference in Massachusetts anything but an impartial, neutral policy of selection, with merely an incidental effect on the opportunities for women. *See, e. g., Castro v. Beecher,* 459 F.2d 725 (1st Cir. 1972); *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). Nor under the circumstances, can the operation of this formula be viewed as an effort by the Commonwealth to set priorities among competing claims for finite state resources. *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Williamson v. Lee Optical Co.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).[8]

*United States v. W. T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953), or that controversies of this type are usually so quickly overtaken by events that the issues raised by the *Anthony* plaintiffs are "capable of repetition, yet evading review." *See, e. g., Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147, 161 (1973); *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). *Cf. Cicchetti v. Lucey,* 514 F.2d 362 (1st Cir. 1975).

7. Our view of the merits makes it unnecessary to consider the plaintiff's position that sex-based classifications are suspect or that the Veterans' Preference deprives the plaintiff of a fundamental right, requiring the state to come forward with a showing that the Veterans' Preference is supported by a "compelling interest" in order for it to be sustained. *See Feinerman v. Jones,* 356 F.Supp. 252, 256–59 (M.D. Pa.1973); *Koelfgen v. Jackson,* 355 F.Supp. 243, 250 (D.Minn.1972), *aff'd mem.* 410 U.S. 976, 93 S.Ct. 1502, 36 L.Ed.2d 173 (1973).

8. This case, therefore, is distinguishable from *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974). There, the California

disability insurance program was attacked because it did not cover expenses incurred as the result of a normal pregnancy, and in so doing placed a disproportionate burden on women. In finding such a limitation on benefits constitutional, the Court noted that the program was financed through a carefully balanced scheme of payroll deductions which did not draw upon general revenues. A requirement that insurance coverage be extended to normal pregnancies which could have cost an additional hundred million dollars, might well have disrupted the program's finances and placed additional burdens on taxpayers and beneficiaries. Under these circumstances, the Court held that the Constitution did not prohibit the state from making a policy judgment to limit premiums and taxes by limiting coverage. Nowhere did the Court hold that *any* state program which had a disproportionate impact on the interests of women would be constitutional or that *any* statute which provided preferential treatment to one class at the expense of another was permissible under the Fourteenth Amendment. In particular *Geduldig* is distinguishable because the class of persons excluded does not consist of all or virtually all women but only pregnant women.

Rather, the Veterans' Preference formula is a deliberate, conscious attempt on the part of the state to aid one clearly identifiable group of its citizens, those who qualify as veterans, by giving them an absolute and permanent preference in public employment. Clearly, the rewarding of those who have rendered public service as members of the military is a worthy state purpose. But, equally as clear is that the means employed by the Commonwealth for achieving that purpose, the preference formula, succeeds at the absolute and permanent disadvantage of another clearly identifiable group, Massachusetts' women.

The pivotal question before us, therefore, is, given the legitimate state purpose of assisting veterans, does the means by which Massachusetts implements that purpose in the area of public employment unconstitutionally deprive women of their equal protection rights under the Fourteenth Amendment. Our answer is that it does and, therefore, that ch. 31, § 23 is unconstitutional.

Massachusetts, like other states, and like the federal government, has consistently provided preferential treatment in public employment to those who have served in the nation's armed forces. See, e. g., Pa. Stat.Ann. tit. 51, § 492.2 et seq. See also 5 U.S.C. §§ 2108, 3309–12, 3316. The modern Veterans' Preference Statute has its roots in legislation enacted in the seventeenth century [9] and represents a key phase of the Commonwealth's continuing efforts on behalf of veterans.[10] The program is designed to encourage service in the armed services, reward those whose lives have been disrupted because they have served, and provide some assistance during the sometimes uneasy transition from military to civilian life.

Nothing in the Fourteenth Amendment prohibits Massachusetts from providing special treatment to veterans in considering candidates for public employment.[11] Rios v. Dillman, 499 F.2d

---

**9.** The first veterans' benefit enacted in this country seems to have been a pension provided by the Plymouth Colony in 1636. Laws of the Colony of New Plymouth [1636] reprinted in The Compact with the Charter and Laws of the Colony 44 (1836). The original public employment preference for veterans was enacted in 1884, Act of June 3, 1884, ch. 320 [1884] Mass. Acts and Resolves 346, and since that time has had what the Supreme Judicial Court has called a "troubled history." Hutcheson v. Director of Civil Service, 361 Mass. 480, 482, 281 N.E.2d 53, 54 (1972). See, e. g., Commissioner of the Metropolitan District Commission v. Director of Civil Service, 348 Mass. 184, 203 N.E.2d 95 (1964); Mayor of Lynn v. Commissioner of Civil Service, 269 Mass. 410, 169 N.E. 502 (1929); Phillips v. Metropolitan Park Commission, 215 Mass. 502, 102 N.E. 717 (1913); Opinion of the Justices, 166 Mass. 589, 44 N.E. 625 (1896); Brown v. Russell, 166 Mass. 14, 43 N.E. 1005 (1896); Note, Preference of Veterans in the Massachusetts Civil Service, 10 Harv.L. Rev. 236 (1896).

In recent years both private interest groups and legislative committees have proposed changes in the Veterans' Preference. See, e. g., League of Women Voters of Massachusetts, The Merit System in Massachusetts (1961); Mass.S.Doc. No. 1080, 34–35; Mass.H.Doc. No. 5100 (1967). Contrary to the defendants' assertions, however, the continuing public debate on the economic and social ramifications of reform of the Massachusetts Veterans' Prefer-

ence does not affect our responsibility to examine the constitutionality of the current scheme.

**10.** The special treatment Massachusetts accords veterans in civil service selection is part of an extensive scheme of state aid to veterans. These benefits include exemptions from license fees, e. g., Mass.Gen.Laws ch. 101, § 24, ch. 175, § 167A, exemption from motor vehicle registration fees, Mass.Gen.Laws ch. 90, § 33, preferences for certain low rent and state funded housing projects, Mass.Gen.Laws ch. 121B, §§ 27, 32(f), 34, exemption from tuition for summer sessions, evening classes, extension and correspondence courses at state colleges and universities, Mass.Gen.Laws ch. 73, § 8A, ch. 69, §§ 7, 7A, and certain retirement benefits. Mass.Gen.Laws ch. 32, §§ 52, 53, 56–58B. See also Committee on Rules of the Two Branches, A Compilation of the Laws Relating to Veterans and Their Organizations (1974).

**11.** The recent cases in which courts have had occasion to sanction the policies behind the Veterans' Preference in the face of attacks based on the Fourteenth Amendment have not involved the type of challenge presented in this case. In neither Rios v. Dillman, 499 F.2d 329 (5th Cir. 1974) nor Koelfgen v. Jackson, 355 F.Supp. 243 (D.Minn.1972), aff'd mem. 410 U.S. 976, 93 S.Ct. 1502, 36 L.Ed.2d 173 (1973) did the court consider whether the statutes involved in those cases discriminated against women. In Feinerman v. Jones, 356 F.Supp.

329 (5th Cir. 1974); *Feinerman v. Jones*, 356 F.Supp. 252 (M.D.Pa.1973); *Koelfgen v. Jackson*, 355 F.Supp. 243 (D.Minn.1972), *aff'd mem.* 410 U.S. 976, 93 S.Ct. 1502, 36 L:Ed.2d 173 (1973). Such a. policy responsibility recognizes both the special problems of veterans and the need to promote an important aspect of the nation's welfare.

▮ But the worthy purpose of a legislative program is not enough to shield its method of implementation from judicial scrutiny, especially in the face of a challenge based on the equal protection clause. In the context of the Fourteenth Amendment, "[t]he result, not the specific intent, is what matters." *Rozecki v. Gaughan*, 459 F.2d 6, 8 (1st Cir. 1972); *Boston Chapter, N.A.A.C.P., Inc. v. Beecher*, 504 F.2d 1017, 1021 (1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). *See, e. g., Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Griffin v. Illinois*, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Guinn v. United States*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915). As Judge Wright has noted: "[t]he arbitrary quality of thoughtlessness can be as disasterous and unfair to private rights and the public interest as the perversity of a willful scheme." *Hobson v. Hansen*, 269 F.Supp. 401, 497 (D.D.C.1967), *aff'd sub nom. Smuck v. Hobson*, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969) (en banc).

It is not enough that the prime objective of the Veterans' Preference statute, that of aiding those who have served in our nation's armed forces, is legitimate and rational. The means chosen by the state to achieve this objective must also be legitimate and rational.] For a court to examine the means of implementation as well as the purpose of a legislative program is not to second-guess the legislature as to what might have been a more effective or preferable course. Rather, by examining the impact on others of a programmatical effort by the state to intentionally benefit one identifiable segment of its population, this court exercises its fundamental responsibility to ensure that all citizens are treated equally and fairly under the law.

The practical effect of Veterans' Preference is clear. Eligible veterans, regardless of qualifications relative to eligible non-veterans, have the public employment field cleared for them on an absolute and permanent basis. The argument that the preference program is somehow related to job qualifications or performance is specious. For each civil service position, the state normally provides selection criteria related to the demands of the particular job. The Veterans' Preference is in no way based on such criteria. On the contrary, it suspends the application of these job-related criteria and substitutes a formula that relegates demonstrable professional qualifications to a secondary position, absolutely and permanently.

The negative impact that this absolute preference has on women is dramatic. The list of nineteen eligibles for the Head Administrative Assistant vacancy sought by Mrs. Feeney at the Solomon Mental Health Center included four women. But for the application of the preference, plaintiff Feeney would have ranked third on the list and would have been among the first set of eligibles considered for the position. Application of the preference, however, relegated Mrs. Feeney to 14th (behind 12 male veterans, 11 of whom received lower scores than she did) and, as a result, she was not certified for consideration for the position.

252 (M.D.Pa.1973), where the Pennsylvania preference was challenged on grounds of sex discrimination, the statute involved there provided for a point-bonus system, as opposed to an absolute and permanent preference for veterans. The court held that on the record presented in that case the plaintiff had not demonstrated that the particular statute challenged operated in a discriminatory way. *See also Russell v. Hodges*, 470 F.2d 212, 218 (2d

Cir. 1972); *White v. Gates*, 102 U.S.App.D.C. 346, 253 F.2d 868, *cert. denied*, 356 U.S. 973, 78 S.Ct. 1136, 2 L.Ed.2d 1147 (1958); *People ex rel. Sellers v. Brady*, 262 Ill. 578, 105 N.E. 1 (1914); *Goodrich v. Mitchell*, 68 Kan. 765, 75 P. 1034 (1904); *State ex rel. Kangas v. McDonald*, 188 Minn. 157, 246 N.W. 900 (1933); *Commonwealth ex rel. Graham v. Schmid*, 333 Pa. 568, 3 A.2d 701 (1938).

Of the four women on the list, none obtained the preference (0%), while 12 of the 15 men (80%) did achieve preferred status. Moreover, in relative terms, the 12 veterans gained an average of four places, while the 4 women lost an average of seven. But for the application of the Veterans' Preference, three of the four women on the list would have been ranked in the top 12 places. Because of the preference, those places were totally occupied by male veterans.

The same pattern is also evident in the much larger Administrative Assistant list which served as a pool for numerous positions in state government. Plaintiff Feeney, whose test score would have put her within the top twenty positions, ranked 70th on the list behind 52 veterans with lower scores and 12 veterans with the same or higher scores. Of the 41 women on the list, 37 were ranked below male veterans who received lower scores than they did; one qualified for the preference (2.5%) while 63 of the 135 men (47%) did so. These 41 women lost an average of 21.5 places each while 63 male veterans gained an average of 28 places each. If the list had been compiled without the Veterans' Preference, nearly 40% of the women would have occupied the top third of the list which is now occupied, with one exception, by men.

The phenomenon illustrated in the lists on which Ms. Feeney was named is not an aberration. The parties have submitted fifty eligible lists in both the *Anthony* and *Feeney* cases, compiled chiefly from 1971 through 1975. Anthony Exhs. 11–60; Feeney Exhs. 13–62. In every one, the application of the Veterans' Preference, in significant fashion, causes men to gain places at the expense of women. Moreover, of the approximately 500 men and 1200 women represented on the lists, 38% of the men are veterans while only 0.6% of the women are veterans. And in each of the lists, one or more female eligibles were placed behind male veterans with lower scores and were

thereby deprived of certification opportunity which, otherwise, they would have had.

To be sure, 43% of the permanent appointments in a ten year period from 1963 to 1973 have been women (even though 56% of the women who took civil service examinations in that 10 year period passed). Yet, a closer examination of those figures reveals, as is conceded by all parties, that the female appointees are generally clerks and secretaries, lower-grade and lower-paying positions for which men traditionally have not applied. Few, if any, females have ever been considered for the higher positions in the state Civil Service.

Women's lack of success in obtaining significant state employment has no relation to any objective standard of assessing qualifications. Rather, the percentage of female civil service appointees is inescapably tied to circumstances totally beyond their control, or choice—the federal government's policy of limiting the number of women who may serve in the armed forces. In practical application, the combination of federal military enrollment regulations with the Veterans' Preference is a one-two punch that absolutely and permanently forecloses, on average, 98% of this state's women from obtaining significant civil service appointments.

Whatever their merit [12] in terms of military priorities, it is clear that federal military enlistment regulations make it unlikely that a woman will serve in the armed forces and, thereby, become eligible for the Massachusetts Veterans' Preference. Facially, the Veterans' Preference is open to both men and women. But to say that it provides an equal opportunity for both men and women to achieve a preference would be to ignore reality. By making status as a veteran the *sine qua non* for obtaining the most attractive positions in the state civil service, Massachusetts has effectively and unquestioningly incorporated into its public employment policy a set of criteria having no demonstrable relation to an individual's

12. We express no opinion on the constitutionality of this series of statutes and regulations affecting the opportunities of women in the armed services.

fitness for civilian public service. By doing so it has caused disasterous negative consequences for the employment opportunities of women, a clearly identifiable segment of the Commonwealth's population entitled to fair and equal protection under the law.

Despite its troublesome impact on the women of this Commonwealth, the operation of the Massachusetts Veterans' Preference might escape constitutional rejection if it were the only means by which the state could implement a program of veterans assistance in the area of public employment. But, the fact is that there are alternatives available to the state to achieve its purpose of aiding veterans, without doing so at the singular expense of another identifiable class, its women.

For example, a point system could be established designed to offer some reward for length of service in the armed forces and/or to recognize particular abilities and skills likely to have been acquired as a result of military service.[13] A time limit for exercising the preference could also be established so as to tailor its use to those who have shortly returned to civilian life. Such approaches would not *absolutely* and *permanently* disadvantage the women of this Commonwealth to the advantage of a male veteran. Of course, the constitutionality of any such alternatives are not now before us. Nor by mentioning them do we assume the role of a super-legislature. We point out such alternatives only to indicate that Massachusetts has considerable flexibility in the manner in which it can aid its veterans, without doing so at the absolute and permanent expense of its women.

While there is no constitutional right to public employment, once a state decides to provide public service jobs, the Fourteenth Amendment demands that it must do so in a fair and equitable manner.[14] But this Veterans' Preference formula, tied as it is to federal military enrollment policy, is neither fair nor equitable in its impact on women. Given the fact that effective, but less drastic, alternatives are available, the state may not give an absolute and permanent preference in the area of public employment to its veterans at the expense of its women who, because of circumstances totally beyond their control, have little if any chance of becoming members of the preferred class. Under these circumstances, this court holds that Mass.Gen.Laws ch. 31, § 23 deprives women of equal protection of the laws and, therefore, is unconstitutional.[15]

### APPENDIX

Mass.Gen.Laws ch. 31, § 23, the heart of the Veterans' Preference provisions of the Massachusetts Civil Service Law, provides:

The names of persons who pass examinations for appointment to any position classified under the civil service shall be placed upon the eligible lists in the following order:—

(1) Disabled veterans as defined in section twenty-three A, in the order of their respective standing; (2) veterans in the order of their respective standing; (3)

---

**13.** The Veterans' Preference provided for applicants to federal civil service positions operates on just such a principle. 5 U.S.C. §§ 2108, 3309, 3311–12, 3316. 5 U.S.C. 3310 gives an absolute preference in the case of a very limited number of positions, but the provisions of this statute are not before us. *See generally* U.S. Civil Service Commission, History of Veterans' Preference in Federal Employment (1956). *Cf. Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Mitchell v. Cohen,* 333 U.S. 411, 68 S.Ct. 518, 92 L.Ed. 774 (1948).

**14.** *Boston Chapter N. A. A. C. P., Inc. v. Beecher,* 504 F.2d 1017 (1st Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775

(1975); *Castro v. Beecher,* 459 F.2d 725 (1st Cir. 1972); *Feinerman v. Jones,* 356 F.Supp. 252, 257–58 (M.D.Pa.1973). *Cf. Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); *Slochower v. Board of Higher Education,* 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); *Wieman v. Updegraff,* 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

**15.** In view of this holding we have no occasion to consider the plaintiff's argument that the Massachusetts Veterans' Preference violates due process by creating an irrebuttable presumption which has no basis in fact.

persons described in section twenty-three B in the order of their respective standing; (4) other applicants in the order of their respective standing. Upon receipt of a requisition, names shall be certified from such lists according to the method of certification prescribed by the civil service rules. A disabled veteran shall be retained in employment in preference to all other persons, including veterans.

Mass.Gen.Laws ch. 4, § 7, cl. 43 provides a general definition of the term veteran.

"Veteran" shall mean any person, male or female, including a nurse, (a) whose last discharge or release from his wartime service, as defined herein, was under honorable conditions and who (b) served in the army, navy, marine corps, coast guard, or air force of the United States for not less than ninety days active service, at least one day of which was for wartime service, provided, that any person who so served in wartime and was awarded a service-connected disability or a Purple Heart, or who died in such. service under conditions other than dishonorable, shall be deemed to be a veteran notwithstanding his failure to complete ninety days of active service.

"Wartime service" shall mean service performed by a "Spanish War veteran", a "World War I veteran", a "World War II veteran", a "Korean veteran", a "Vietnam veteran", or a member of the "WAAC" . . ..

None of the following shall be deemed to be a "veteran":

(a) Any person who at the time of entering into the armed forces of the United States had declared his intention to become a subject or citizen of the United States and withdrew his intention under the provisions of the act of Congress approved July ninth, nineteen hundred and eighteen.

(b) Any person who was discharged from the said armed forces on his own application or solicitation by reason of his being an enemy alien.

(c) Any person who was designated as a conscientious objector upon his last discharge or release from the armed forces of the United States.

(d) Any person who has been proved guilty of wilful desertion.

(e) Any person whose only service in the armed forces of the United States consists of his service as a member of the coast guard auxiliary or as a temporary member of the coast guard reserve, or both.

(f) Any person whose last discharge or release from the armed forces is dishonorable.

"Armed forces" shall include army, navy, marine corps, air force and coast guard.

"Active service in the armed forces", as used in this clause shall not include active duty for training in the army national guard or air national guard or active duty for training as a reservist in the armed forces of the United States.

Mass.Gen.Laws ch. 31, §§ 21 and 21A then add to the general definition provided in chapter 4.

Section 21 provides:

[t]he word "veteran" as used in this chapter shall mean: any citizen who—

(a) Is a veteran as defined in clause Forty-third of section seven of chapter four, or (b) meets all the requirements of said clause Forty-third except that instead of performing wartime service as so defined he has been awarded one of the campaign badges enumerated in this section, or has been awarded the congressional medal of honor.

"Campaign badges" shall include the following and no other:—

Indian Campaign, Mexican Service, Mexican Border Service, Army of Cuban Occupation, Army of Puerto Rican Occupation, Nicaraguan Campaign nineteen hundred and twelve, Haitian Campaign nineteen hundred and fifteen, or nineteen hundred and nineteen and nineteen hundred and twenty, Dominican Campaign, Second Nicaraguan Campaign, Yangtze Service, Army of Occupation of Germany, China Service, Navy Occupation Service,

Army of Occupation, or Medal for Humane Action.

Section 21A provides:

[f]or the purpose of this chapter only, the word "veteran" shall include any person who meets all the requirements of section twenty-one except that instead of performing ninety days' active service, including ten days' wartime service as so defined, he has performed active service in the armed forces of the United States at any time between April sixth, nineteen hundred and seventeen and November eleventh, nineteen hundred and eighteen, inclusive, or any person with active service in the armed forces at any time between September sixteenth, nineteen hundred and forty and June ninth, nineteen hundred and fifty-four, inclusive, who took an examination or filed an application on or before June ninth, nineteen hundred and fifty-four or who was on an existing civil service eligible list on said date.

LEVIN H. CAMPBELL, Circuit Judge (concurring).

I join the opinion of the court, and wish only to reemphasize the limited reach of our holding. A state may lawfully enact legislation to benefit its veterans, and one way that it may do so is by giving them preference in the obtaining of public employment. But I see a basic distinction between giving veterans credit and even a headstart over other jobseekers on the one hand, and on the other giving them complete entitlement to the most desirable jobs, no matter what the competition. The Massachusetts veterans preference statute does the latter, and I therefore believe it goes too far, by creating a preference so absolute that all women, except the very few who are veterans, are effectively and permanently barred from all areas of civil service employment not shunned by men.

Admittedly the statute is not on its face gender-based, and I agree with Judge Murray that a state, in pursuit of its lawful objects, can go very far in enacting legislation that has an incidental impact upon persons of one gender. But surely if legislation has the effect of broadly excluding a constitutionally protected group such as women from opportunities normally open to all, there comes a point where courts must ask not only whether the state's aims are lawful but whether the means are permissible. Here I am of the opinion that the exclusionary impact is so total as to amount to a denial of equal protection under the fourteenth amendment. There are available to Massachusetts many other means for aiding and preferring its veterans which would not lead to a near blanket, permanent exclusion of all women from a major sector of employment.

FRANK J. MURRAY, District Judge (concurring in part and dissenting in part).

I concur in the opinion and judgment of the court in the *Anthony* case.

The court holds in the *Feeney* case that Mass.Gen.Laws ch. 31, § 23 is unconstitutional because it deprives women of equal protection of the laws. In reaching this result the court acknowledges that the Massachusetts Veterans' Preference statutory scheme "was not enacted for the purpose of disqualifying women from receiving civil service appointments", *ante* at 495, that the policy of "rewarding . . . those who have rendered public service as members of the military is a worthy state purpose", *id.* at 496, and that ". . . there is no constitutional right to public employment". *Id.* at 499. The court also declares that there is nothing in the Fourteenth Amendment that prohibits the state from "providing special treatment to veterans in considering candidates for public employment", *id.* at 496, and that such a state policy "responsibly recognizes both the special problems of veterans and the need to promote an important aspect of the nation's welfare". *Id.* at 497. I find nothing in the statutory scheme to support the supposition that the Commonwealth in furtherance of the legitimate state purposes referred to by the court has created a statutory classification which is either gender based or invidiously discriminates against women.

As justification for its holding, the court employs a means/end calculus to assess the constitutionality of the Veterans' Preference statute by analyzing the effect on women of its implementation. Using this analysis the court concludes that while the end of rewarding veterans is legitimate and rational, the means adopted by the statutory scheme to achieve the end are not. At the heart of the court's decision is the conclusion that there is justification in the Equal Protection Clause for a court to exercise "its fundamental responsibility to ensure that all citizens are treated equally and fairly under the law". *Id.* at 497. This largely unobjectionable general statement of justification can quite easily be read as authority for a court's displacement of every choice of classification made by a legislature.[1] Considerations of federalism and separation of powers, however, have disciplined the exercise of this "responsibility" by causing development by the Supreme Court of certain traditional principles for evaluation of equal protection challenges to state legislation. The central theme of the equal protection analysis developed by the Supreme Court has been the search for the proper standard of review by which to measure challenged legislation. I find in the court's opinion here with its means/end calculus neither sufficient concern for the institutional considerations militating against displacement of state legislation nor a fully articulated standard by which the legislature's choice of means should be evaluated. Having concluded that proper concern for the relevant considerations leads to a standard of review under which the legislation challenged in this case must be sustained, I respectfully dissent for the reasons stated below.

## I

In addressing an equal protection challenge to state legislation a court must be sensitive to the crucial institutional considerations which define its role as that of restraint when called upon to interpose its judgment against the judgment of the political processes of the states. Justice Brennan has noted that "[t]he maintenance of the principles of federalism is a foremost consideration in interpreting any of the pertinent constitutional provisions under which [the Supreme] Court examines state action". *Allied Stores of Ohio v. Bowers,* 358 U.S. 522, 532, 79 S.Ct. 437, 444, 3 L.Ed.2d 480, 488 (1959) (Brennan, J., concurring). Principles of federalism are not merely a recognition "that our Constitution is an instrument of federalism", *id.,* but also a recognition of the value of state experimentation with a variety of means for solving social and economic problems. *Cf. New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747, 771 (1932) (Brandeis, J., dissenting). *See Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) (Black, J., for the Court, for a discussion of "Our Federalism"). In approaching the legislation challenged here these principles require due recognition of the settled arrangements adopted by virtually every state legislature[2] —not to mention the Federal Government[3] —granting some form of veterans preference in public employment.

The doctrine of separation of powers requires that the courts give deference to the

---

1. Professor Cox has noted, "[o]nce loosed the idea of Equality is not easily cabined". Cox, *The Supreme Court, 1965 Term-Foreword: Constitutional Adjudication and the Promotion of Human Rights,* 80 Harv.L.Rev. 91 (1966). The Equal Protection Clause has not been read, however, as a general warrant to rewrite legislation because some persons are treated differently from others in the classification schemes established by legislation. "Classification is inherent in legislation; the Equal Protection Clause has not forbidden it." *Morey v. Doud,* 354 U.S. 457, 472, 77 S.Ct. 1344, 1354, 1 L.Ed.2d 1485, 1496 (1957). (Frankfurter, J., dissenting).

2. All but four states use a veterans preference in connection with public employment appointments. Brief for the Defendants at 34 n. 9. *Cf. Koelfgen v. Jackson,* 355 F.Supp. 243, 252 n. 9 (D.Minn.1972), *aff'd mem.* 410 U.S. 976, 93 S.Ct. 1502, 36 L.Ed.2d 173 (1973).

3. 5 U.S.C. §§ 2108, 3309–12, 3316.

means by which the representative branches of government choose to implement state policies. Justice Harlan has succinctly summarized the dangers inherent in overly intrusive judicial review of legislation:

It is said that there can be nothing wrong with courts exercising [active judicial review] because whatever they may do can always be undone by legislative enactment or constitutional amendment . . . [But] in the end what would eventuate would be a substantial transfer of legislative power to the courts.

Harlan, *Thoughts at a Dedication: Keeping the Judicial Function in Balance,* 49 A.B. A.J. 943, 944 (1963).

The issue for the courts examining challenged legislation, as Justice Douglas, speaking for the Court, put it in a case upholding a state statute which discriminated against men on the basis of gender as such,

is not whether the statute could have been drafted more wisely, but whether the lines chosen by the . . . Legislature are within constitutional limitations. The dissents would use the Equal Protection Clause as a vehicle for reinstating notions of substantive due process that have been repudiated. "We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, which are elected to pass laws." Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93, 97.

*Kahn v. Shevin,* 416 U.S. 351, 356 n. 10, 94 S.Ct. 1734, 1737, 40 L.Ed.2d 189, 194 (1974).

In weighing the separation of powers considerations inherent in any constitutional challenge to legislation "it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts". *Missouri, K. & T. Ry. v. May,* 194 U.S. 267, 270, 24 S.Ct. 638, 639, 48 L.Ed. 971, 973 (1904) (Holmes, J.). It is therefore not inapposite to note in considering the challenge here that Congress has taken an ac-

tive role in defining the applicability of the Fourteenth Amendment to gender discrimination in the employment context through Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e–2. Congress, however, has specifically chosen to protect veterans preference legislation from challenge under Title VII. 42 U.S.C. § 2000e–11.[4] To paraphrase Justice Brennan in *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), the judgment of a coequal branch of government which has specifically addressed the issue of accommodating equal employment rights with veterans preference legislation is not without significance in evaluating the question presented in this case. *Id.* at 687–88, 93 S.Ct. at 1770–71, 36 L.Ed.2d at 592.

II

Guidance for judicial inquiry in an equal protection case is set out in *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), where the Court said "we look, in essence, to three things: the character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification". *Id.* at 335, 92 S.Ct. at 999, 31 L.Ed.2d at 280. The gravamen of plaintiff Feeney's complaint is that the statute and its implementation "unlawfully discriminate in public employment on the basis of sex". Para. 36. The Supreme Court, in recent cases, has defined sex discrimination as dissimilar treatment of men and women who are similarly situated. *Frontiero v. Richardson, supra,* 411 U.S. at 688, 93 S.Ct. at 1771, 36 L.Ed.2d at 592, citing *Reed v. Reed,* 404 U.S. 71, 77, 92 S.Ct. 251, 254, 30 L.Ed.2d 225, 230 (1974).

Treating the statutory classification first, it is obvious that the division between veterans and non-veterans is not drawn along sex lines and does not provide for dissimilar treatment for similarly situated men and women. On its face the statute is neutral, and, beyond that, there is no showing that the statutory class distinctions "are mere pretexts designed to effect an invidious dis-

4. *Cf.* EEOC, Decision 74–64, CCH Emp.Prac.Guide ¶ 6419.

crimination against the members of one sex or the other   .   .   .". *Geduldig v. Aiello*, 417 U.S. 484, 496–97 n.20, 94 S.Ct. 2485, 2492, 41 L.Ed.2d 256, 265 (1974). The statute was not passed to disqualify women from civil service appointments, as the court has acknowledged. *Ante* at 495. If there exists the almost insuperable barrier to women attaining higher level civil service jobs, a result the court has found, it is a circumstance that non-veteran women share with a large number of non-veteran men.[5] This circumstance presents an even less compelling claim for sex discrimination than *Geduldig v. Aiello, supra*, where only women were in the group burdened by the classification.[6] I cannot assent to the supposition that plaintiff has shown the classification challenged here to be sex based or that it invidiously discriminates against women.[7] Having reached that conclusion, I, like the court, find it unnecessary to address the question whether sex discrimination involves legislative creation of a suspect category.[8]

It is clear that plaintiff Feeney's interest at stake in the case is her interest in appointment to an administrative assistant position in the civil service. There is, to be sure, a due process dimension to the procedures by which the Commonwealth provides for the allocation of civil service jobs.[9]

---

**5.** The agreed statement of facts filed by the parties indicates that 852,000 male veterans and 16,000 female veterans reside in the Commonwealth. The agreed statement also indicates that approximately 1,823,000 males and 1,990,000 females over the age of 18 live in the Commonwealth. Feeney Statement ¶ 31. Based upon these figures, approximately 53 percent of the males over the age of 18 and 99 percent of the females over 18 in the Commonwealth are non-veterans.

**6.** The court distinguishes *Geduldig* on the basis of the subject matter of the legislation challenged there—California's disability insurance program. *Ante* at 495 n.8. But the principle teaching of *Geduldig* as I view it is the definition of sex discrimination. The Supreme Court's definition stated therein, as legislation that is either based on gender as such or invidiously discriminates against one or the other sex, has led one commentator who favors a much broader constitutional definition of sex discrimination to conclude that:

> the Court will not find states to be engaging in invidious discrimination in violation of the equal protection clause where they draw distinctions between men and women on the basis of traits exclusive and peculiar to one or the other sex.

Comment, *Geduldig v. Aiello, Pregnancy Classifications and the Definition of Sex Discrimination*, 75 Colum.L.Rev. 441, 442 (1975).

**7.** The court states that "in the context of the Fourteenth Amendment '[t]he result, not the specific intent, is what matters,'" *ante* at 497, citing six cases in support of that proposition. I find nothing in the cases cited, particularly in light of the teaching of *Geduldig* regarding the definition of sex discrimination, to justify an "impact" theory of discrimination here. *Cf. Smith v. Troyan*, 520 F.2d 492 (6th Cir. 1975), *petition for cert. filed*, 44 U.S.L.W. 3360.

**8.** A majority of the Supreme Court has not yet been found to declare sex discrimination a suspect classification. *Cf. Frontiero v. Richardson*, 411 U.S. 677, 682–88, 93 S.Ct. 1764, 1768–71, 36 L.Ed.2d 583, 589–593 (1973) (Brennan, J., for plurality contending sex is suspect classification). A majority of the Court has apparently not found it necessary to reach the question. *Cf. Stanton v. Stanton*, 421 U.S. 7, 13, 95 S.Ct. 1373, 1377, 43 L.Ed.2d 688, 694 (1975); *Smith v. Troyan*, 520 F.2d at 495 n.6.

**9.** *See, e. g., Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The court takes the position that the Fourteenth Amendment "demands that [a state providing public employment] must do so in a fair and equitable manner". *Ante* at 499 & n.14. I do not read *Boston Chapter N.A.A.C.P., Inc. v. Beecher*, 504 F.2d 1017 (1st Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975), and *Castro v. Beecher*, 459 F.2d 725 (1st Cir. 1972), to mandate in a public employment context a more rigorous constitutional concept than is required by traditional equal protection analysis or by Title VII when applicable. As the court pointed out in *Feinerman v. Jones*, 356 F.Supp. 252:

> All of the cases which have talked of the need for compelling state interests in connection with state employment practices have either involved other constitutional rights, such as first amendment freedoms, or have dealt with the exclusion or dismissal of people from public employment on arbitrary grounds without proper due process procedures.

*Id.* at 258.

Plaintiff's due process argument that the statute is unconstitutional because it raises an irre-

More to the point for purposes of analysis of equal protection grounds, the basis on which the court rests its decision, is whether plaintiff's interest in public employment can be termed a "fundamental interest", a term having specific consequences for determination of the proper standard of federal review of the legislation. The Supreme Court in *San Antonio Independent School District v. Rodriquez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), articulated the "key to discovering" whether an asserted individual interest can be viewed to be of such fundamental importance that unequal treatment of the interest under a state statute, absent a strong showing of justification, will require a federal court to strike down the legislation. The Court there stated that "the answer lies in assessing whether [the interest is] explicitly or implicitly guaranteed by the Constitution". *Id.* at 33–34, 93 S.Ct. at 1297, 36 L.Ed.2d at 43, see *Shapiro v. Thompson*, 394 U.S. 618, 642, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600, 619 (1969) (Stewart, J., concurring). As the court here acknowledges, *ante* at 499, there is no constitutional right to public employment, and, therefore, under traditional equal protection analysis the plaintiff's interest cannot be viewed to be a "fundamental interest".

There are valid reasons which justify the Commonwealth's interest in creating a preference for veterans, that is, of providing special benefits to a class of persons deemed to have made special sacrifices for their country. In *Feinerman v. Jones*, 356 F.Supp. 252 (M.D.Pa.1973) (three-judge court), the "underlying justifications" of upholding Veterans' Preference legislation were expressed:

> buttable presumption that non-veterans are not as qualified for civil service positions as are veterans is not persuasive. The doctrine of irrebuttable presumptions is directed at statutory schemes which raise evidentiary presumptions against a specific class. *See, e. g., Board of Educ. v. LaFleur*, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Vlandis v. Kline*, 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973). The due process objection to these presumptions is that they cannot be overcome by factual dem-

(1) As a recognition that the experience, discipline, and loyalty which veterans gain in military service is conducive to the better performance of public duties;

(2) As a reward for those veterans who, either involuntarily or through enlistment, have served their country in time of war; and

(3) As an aid in the rehabilitation and relocation of the veteran whose normal life style has been disrupted by military service. [Footnote omitted.]

*Id.* at 259. Other courts have held these reasons a valid basis for the statutory classification of veterans and non-veterans. *See Russell v. Hodges*, 470 F.2d 212, 218 (2d Cir. 1972); *Koelfgen v. Jackson*, 355 F.Supp. 243 (D.C.Minn.1972) (three-judge court), *aff'd mem.* 410 U.S. 976, 93 S.Ct. 1502, 36 L.Ed.2d 173 (1973). *Cf. Hutcheson v. Director of Civil Service*, 361 Mass. 480, 281 N.E.2d 53 (1972).[10] There is nothing in the Fourteenth Amendment that precludes the granting of a preference to veterans who have initially passed a civil service examination.

### III

Traditional equal protection analysis has presented a court with a choice of tests to determine the validity of challenged state legislation—restrained review and active review. *See generally, Developments in the Law—Equal Protection*, 82 Harv.L.Rev. 1065, 1076–1132. As the Supreme Court stated in *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 172, 92 S.Ct. 1400, 1405, 31 L.Ed.2d 768, 777 (1972): "The tests to determine the validity of state statutes under the Equal Protection Clause have been variously expressed, but this Court requires,

> onstration. The classification effected by the Veterans' Preference statute under attack here is of a different character. It does not represent an evidentiary assumption, rather it represents a policy choice of rewarding one class of citizens.

10. *See also Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974); *Mitchell v. Cohen*, 333 U.S. 411, 68 S.Ct. 518, 92 L.Ed. 774 (1948).

at a minimum, that a statutory classification bear some rational relationship to a legitimate state purpose". Active review, a strict standard of review under the Equal Protection Clause, which requires the state to show that the statutory classification was necessary to promote a "compelling state interest", is called for only when the discrimination is based on a classification of a suspect character or adversely affects a fundamental interest. The factual requirements calling for active review are not present here and a more restrained standard of review should be applied.[11]

Assuming *arguendo* that the statutory scheme challenged here is sex discrimination, plaintiff's claim should be tested by a standard of review which lies somewhere between restrained review and active review.[12] In *Reed v. Reed, supra,* where the classification in the statute was explicitly sex based, the standard articulated was that the challenged classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike". 404 U.S. at 76, 92 S.Ct. at 254, 30 L.Ed.2d at 229, citing *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989, 990 (1920). This traditionally deferential articulation of the standard has been applied in gender-based classification cases with a good deal more vigor than would normally be associated with restrained review. An intermediate standard has been articulated and applied in cases involving gender-based discrimination as embodying a requirement that the state show "a factually demonstrable distinction between the po-

sitions of the men and women affected by the classification which is substantially related to its objective". *Women's Liberation Union of Rhode Island v. Israel,* 512 F.2d 106, 108 (1st Cir. 1975). *See also,* Nowak, *Realigning the Standards of Review Under the Equal Protection Guarantee—Prohibited, Neutral, and Permissive Classifications,* 62 Geo.L.J. 1071 (1974). Even assuming this case involves sex discrimination, based on the court's finding on the record here of nonintentional adverse discriminatory impact on women, a less stringent standard of review than the demonstrable rational basis test is justified. *Cf. Castro v. Beecher,* 459 F.2d 725, 733 (1st Cir. 1972).

## IV

In applying the demonstrable rational basis test to the case here, it should be recognized that the Veterans' Preference statute and the civil service regulations represent a fully considered "rough accommodation"[13] of the Commonwealth's interests which come into play when priorities are set for the allocation of a limited state resource. *Cf. San Antonio Independent School District v. Rodriquez,* 411 U.S. at 55, 93 S.Ct. at 1308, 36 L.Ed.2d at 55. The scheme provides for identification through a test of the pool of applicants qualified to perform a specific job; it then arranges the qualified persons on an eligibility list in the order of their performance on the test. The statute provides that the names of persons who pass the examinations for appointment to a civil service position shall be divided into two classes: veterans and non-veterans. Those men and women placed in the veterans classification receive the benefit of the statute and those men and women not classed as veterans do not receive the bene-

11. *See* Section II of this opinion *supra.*

12. As more fully discussed in Section II *supra,* I have concluded that this case does not involve sex discrimination. Accordingly, the standard of review I would employ here would be one even less demanding than that discussed in the text in Sections III and IV.

13. The Veterans' Preference and the civil service scheme have been modified from time to time throughout their history and the Common-

wealth has not been adverse to limiting the breadth of the preference. Brief for the defendants at 44–45. The Commonwealth's efforts to adjust the competing interests involved in civil service selection procedures are well illustrated by the disposition of the *Anthony* case. This change in the application of the Veterans' Preference is but a recent illustration of the Commonwealth's continuing efforts to accommodate the claims of diverse groups for the limited number of state jobs.

fit of the statute. The preference is integrated into the scheme by placing qualified veterans at the top of the eligibility list. The statutory scheme incorporates in two ways a policy of the Commonwealth that raw test score need not be the absolute measure of whether an individual should be chosen for a job. First, it provides certification to an appointing authority in order of appearance on the list of a number of persons greater than the number of jobs available, but leaves the appointing authority free to select a certified applicant irrespective of the applicant's test score; second, the scheme gives special advantage in placement on the list to qualified veterans.

The clear purpose of the statute is to prefer qualified veterans for consideration for civil service jobs, and analysis of the statutory scheme and the civil service regulations demonstrates that the classification at the very least substantially serves and furthers obvious state interests. To assert that the legislation "suspends the application of . . . job-related criteria and substitutes a formula that relegates demonstrable professional qualifications to a secondary position, absolutely and permanently", *ante* at 497, or that the Commonwealth has "incorporated into its public employment policy a set of criteria having no demonstrable relation to an individual's fitness for civilian public service", *ante* at 498, assumes the unacceptable premise that only selection criteria adhering exclusively and strictly to raw test score meet the standard of "demonstrable professional qualifications". Irrespective of whether the preference for veterans is applied in the selection of an applicant for a civil service job, the Commonwealth, as noted above, does deviate from the raw test scores in its selection procedures. The assertion that the preference is absolute and permanent is but another way of arguing that "the preference accorded to veterans is simply too great", *cf. Rios v. Dillman*, 499 F.2d 329, 332 (5th Cir. 1974), not that there is no rational basis for the classification.

The Commonwealth's Veterans' Preference statute is based on the factually demonstrable distinction of whether or not a person is a veteran. This classification is substantially related to the Commonwealth's purpose to benefit veterans in the area of public employment. The Commonwealth's choice of means to implement the purpose does not invidiously discriminate against women. The issue is whether the means chosen by the Commonwealth are within constitutional limitations, and as I believe they are I am unwilling to engage in speculation regarding alternative measures [14] for achieving the statutory purpose. I would uphold the statute.

---

14. A bonus point Veterans' Preference such as the one employed by the Federal Government, *ante* at 499 & n.13, is one which would appear to have no practical effect of benefiting non-veteran women, like the plaintiff, seeking administrative assistant positions. After reordering the administrative assistant list, *see* Brief of the Plaintiffs at 235–38, to apply a bonus point preference system like the Federal system, it appears that the highest non-veteran woman would not be reached until at least eighteen names are certified from the list. Plaintiff would not be reached under such system until at least 31 names are certified. Since under civil service procedure the number of requisitioned positions would result in certification of no more than eleven names, no benefit would accrue under such bonus point system to non-veteran women generally and plaintiff in particular.