MITCHELL ET AL., MEMBERS OF THE CIVIL SERVICE COMMISSION, v. COHEN.

NO. 130.

Argued January 6, 1948.—Decided March 8, 1948.

412

*Herbert A. Bergson* argued the cause for petitioners. With him on the brief were *Solicitor General Perlman, Paul A. Sweeney* and *Oscar H. Davis.*

*Gerhard A. Gesell* argued the cause and filed a brief for respondents.

MR. JUSTICE MURPHY delivered the opinion of the Court.

The problem here is whether temporary members of the Volunteer Port Security Force of the Coast Guard Reserve are entitled to veterans' preference in federal employment by virtue of the Veterans' Preference Act of 1944.[1]

Pursuant to § 207 of the Coast Guard Auxiliary and Reserve Act of 1941,[2] approximately 70,000 persons were enrolled as temporary members of the Coast Guard Reserve. The Reserve was a military organization estab-

---

[1] 58 Stat. 387, 5 U. S. C. (Supp. V, 1946) § 851.

[2] 55 Stat. 9, 12, as amended, 14 U. S. C. (Supp. V, 1946) § 307.

■■■■■■■■■■■■■■■■

lished as a component part of the Coast Guard "to enable that service to perform such extraordinary duties as may be necessitated by emergency conditions." [3]   The Coast Guard, in turn, was created as a military service and constitutes "a branch of the land and naval forces of the United States." [4]   On November 1, 1941, the President directed that the Coast Guard operate as part of the Navy subject to the orders of the Secretary of the Navy.[5]

Of the various classifications of temporary members of the Coast Guard Reserve,[6] the largest was known as the Volunteer Port Security Force.  Service therein was purely voluntary and was devoted to such activities as the patrol and guarding of harbors, waterfronts, docks, bridges, ships and industrial shore establishments.  The members of this force took the oath of allegiance required of the regular members of the Coast Guard.  They were enrolled "for the duration of the war upon the completion of which you will be disenrolled unless the period of your enrollment is sooner terminated by Coast Guard authority." [7]  In actual practice, however, the members were usually permitted to leave the Force at any time by making a request to the commanding officer of the unit to

---

[3] § 201 of the Coast Guard Auxiliary and Reserve Act of 1941, 55 Stat. 9, 11, as amended, 14 U. S. C. (Supp. V, 1946) § 301.

[4] 55 Stat. 585, 14 U. S. C. § 1.

[5] Executive Order No. 8929, 6 Fed. Reg. 5581.

[6] The other classifications were: (1) Full-time active duty with military pay and allowances; (2) Pilots without pay and allowances other than for uniforms, but paid by their own companies; (3) Officers of Great Lakes vessels without pay and allowances other than for uniforms, but paid by their own companies; (4) Coast Guard police without pay and allowances; (5) Civil Service employees of the Coast Guard enrolled for full-time active duty without pay other than compensation for their civilian positions.

[7] From the form entitled "Temporary Member of Coast Guard Reserve—Enrollment and Active Duty Assignment."

which they were assigned. They were given a "Certificate of Disenrollment" upon severance from the Force, honorable discharges and mustering-out pay not being provided.

Members of the Volunteer Port Security Force were obligated to be on active duty "only as directed by competent authority for a minimum of 12 hours per week." [8] It does not appear that their active duty exceeded that amount to any substantial degree. Because of the small number of hours of service, most members were able to continue their regular civilian employment with little or no interference. They could not be transferred from the cities in which they lived without their consent. Efforts were made by the Coast Guard to assign the 12-hour weekly duty periods to fit the convenience of the members. And many of them were disenrolled at their own request upon representations that their duty assignments conflicted with their civilian employment. They could also be excused from duty if they found it temporarily inconvenient.

These members performed their duties without pay. In most cases, however, they received an allowance for uniforms; and in some instances they received food or subsistence allowance while on active duty. Military status attached to them only during periods when they were actually engaged on active duty or en route to and from such duty. While on active duty they wore their uniforms, were subject to the usual Coast Guard discipline and were vested with the same authority as members of the regular Coast Guard of similar rank.

---

[8] *Ibid.* It also appears from this form that those mentioned in classifications (2) and (5) in footnote 6, *supra,* were subject to call at all times. Apparently the other classifications, including the Volunteer Port Security Force, were not subject to such a call.

At all times the members of the Volunteer Port Security Force remained subject to the Selective Training and Service Act of 1940. They were required to register and were liable for induction into the regular armed forces. In fact, many of them did enlist or were drafted into those forces, thereby necessitating their disenrollment as temporary members of the Coast Guard Reserve. If illness or disease occurred while on duty, they were accorded the same hospital treatment as members of the regular Coast Guard. But if they were injured or killed in the line of duty, they were entitled only to the benefits prescribed by law for civilian employees of the United States. Moreover, they were ineligible for the benefits of National Service Life Insurance.

Respondent Cohen enrolled on April 13, 1944, as a member of the Volunteer Port Security Force and was assigned to duty with the Captain of the Port, Washington, D. C. He performed his part-time duties without compensation and without interruption to his regular employment as a civilian economist in the War Department. He was disenrolled on September 5, 1945, having served on active duty on 58 days for a total service of 398 hours. Respondent Hubickey was enrolled in the Force on October 18, 1944, and was assigned to duty with the Captain of the Port, Philadelphia, Pa. He too performed his part-time duties without compensation and without interference with his regular work as a civilian naval architect in the Navy Department. On September 30, 1945, he was disenrolled, having served on active duty on 32 days for a total service of 250 hours.

On April 4, 1944, before the passage of the Veterans' Preference Act, the Civil Service Commission had ruled that the duties performed by those enrolled in the Volunteer Port Security Force entitled them to veterans' preference in federal employment under the then existing

preference laws.[9] But on November 4, 1944, after the enactment of the statute in question and pursuant to a recommendation of the Acting Secretary of the Navy, the Commission changed this ruling and decided that such duties did not entitle one to veterans' preference under the terms of the statute.[10]

The two respondents were denied veterans' preference in their government employment in accordance with the Commission's second ruling. Due to general reductions in force, respondent Cohen was discharged from the War Department and respondent Hubickey was notified that he would be discharged from the Navy Department. They then brought these actions to compel the members of the Commission to classify them as preference eligibles; they also asked the court to adjudge and declare them entitled to the status of preference eligibles under the provisions of the Veterans' Preference Act. The District Court granted summary judgments in their favor. 69 F. Supp. 54. The Court of Appeals affirmed, one justice dissenting. 160 F. 2d 915. We brought the cases here on certiorari, the problem raised being one of importance in the administration of the Veterans' Preference Act.

---

[9] Circular Letter No. 4145 to Regional Directors and Division Chiefs of the Commission. This provided that active duty performed by temporary members of the Coast Guard Reserve, whether full-time, part-time, or intermittently, either with or without pay, including Government employees enrolled without pay other than the compensation of their civilian positions, constituted active duty as distinguished from training duty and entitled the member performing such duty to preference benefits under the then existing preference laws.

[10] Departmental Circular No. 508 to Heads of Departments and Independent Establishments. This modified the earlier ruling and provided that only those temporary Coast Guard Reservists performing full-time duty with pay and allowances at shore stations or aboard Coast Guard vessels were entitled to preference under the Veterans' Preference Act of 1944.

The pertinent portion of the Veterans' Preference Act is to be found near the end of § 2. That establishes preference in government employment for "those ex-servicemen and women who have served on active duty in any branch of the armed forces of the United States, during any war, . . . and have been separated therefrom under honorable conditions."

Respondents claim that their service with the Volunteer Port Security Force brings them squarely within this statutory provision, hence entitling them to veterans' preference. It is undisputed, of course, that they did serve part-time on active duty in a branch of the armed forces of the United States during World War II and that they were separated therefrom under honorable conditions. The crucial question is whether they thereby are "ex-servicemen" within the meaning of this particular statute. On that score, respondents urge that this term must be given its ordinary and literal meaning so as to refer to all those who performed military service.[11] The length or continuity of active duty and the presence or absence of compensation become immaterial from respondents' point of view; the mere performance of some type of military service is thought to be sufficient. Since respondents concededly did perform military service while on intermittent active duty with the Volunteer Port Security Force, the conclusion is reached that they are "ex-servicemen" within the contemplation of this statute. Resort to the legislative history and other secondary sources is said to be unwarranted, so clear and obvious is the meaning of that term.

In our opinion, however, the term "ex-servicemen" has no single, precise definition which permits us to read and

---

[11] Respondents point out that the word "serviceman" is defined as "One who has performed military service." Webster's New International Dictionary, 2d ed. (1942).

apply that term without help from the context in which it appears and the purpose for which it was inserted in the statute. Ex-servicemen are indeed those who have performed military service. And they may include those who have served on active duty only part-time and without compensation. But this designation may also be confined to a more definite and narrow class of individuals who performed military service, to those whose full time and efforts were at the disposal of military authorities and whose compensation included military pay and allowances. Such ex-servicemen are those who completely disassociated themselves from their civilian status and their civilian employment during the period of their military service, suffering in many cases financial hardship and separation from home and family. They formed the great bulk of the regular armed forces during World War II. In the popular mind, they were typified by the full-fledged soldier, sailor, marine or coast guardsman. Our problem, of course, is whether Congress used the term "ex-servicemen" in the broad or narrow sense when it enacted the Veterans' Preference Act. And the answer to that problem is to be determined by an examination of the statutory scheme rather than by reliance upon dictionary definitions.

The Veterans' Preference Act was enacted in 1944 to aid in the readjustment and rehabilitation of World War II veterans. It was felt that the problems of these returning veterans were particularly acute and merited special consideration. Their normal employment and mode of life had been seriously disrupted by their service in the armed forces and it was thought that they could not be expected to resume their regular activities without reemployment and rehabilitation aids. The Federal Government, in its capacity as an employer, determined to

take the lead in such a program.[12]   The Veterans' Preference Act was accordingly adopted, creating special preference and protection for returning veterans at every stage of federal employment.

Throughout the legislative reports and debates leading to the birth of this statute is evident a consistent desire to help only those who had sacrificed their normal pursuits and surroundings to aid in the struggle to which this nation had dedicated itself.[13]   It was the veterans or ex-servicemen who had been completely divorced from their civilian employment by reason of their full-time service with the armed forces who were the objects of

---

[12] "I believe that the Federal Government, functioning in its capacity as an employer, should take the lead in assuring those who are in the armed services that when they return special consideration will be given to them in their efforts to obtain employment.   It is absolutely impossible to take millions of our young men out of their normal pursuits for the purpose of fighting to preserve the Nation, and then expect them to resume their normal activities without having any special consideration shown them.

"The problems of readjustment will be difficult for all of us.   They will be particularly difficult for those who have spent months and even years at the battle fronts all over the world.   Surely a grateful nation will want to express its gratitude in deeds as well as in words."

Letter from the President to Rep. Ramspeck, quoted in H. R. Rep. No. 1289, 78th Cong., 2d Sess., p. 5.

[13] H. R. Rep. No. 1289, 78th Cong., 2d Sess.; S. Rep. No. 907, 78th Cong., 2d Sess.; 90 Cong. Rec. 3501–3507.   The House report stated (p. 3): "Private employers and corporations, as well as State, county, and municipal governments, have been urged through the selective-service law and otherwise to afford reemployment to veterans when they leave the armed forces.   Your committee feels that the Federal Government should set the pace, and that this proposal is an essential part of the reemployment and rehabilitation program."   The Senate report stated (p. 1): "The committee believes that in view of the fact that members of the armed forces rapidly are being returned to civilian life, the bill should be enacted without delay."

Congressional solicitude. Reemployment and rehabilitation were considered to be necessary only as to them.

There is nothing to indicate that the legislative mind in this instance was directed toward granting special benefits or rewards to those who performed military service without interference with their normal employment and mode of life. As to them, assistance in reemployment and rehabilitation was thought unnecessary. Their civilian employment status remained unchanged by reason of their military service. And since their civilian life was substantially unaltered, there was no problem of aiding their readjustment back to such a life. Indeed, to have given them preference rights solely because of their part-time military service would have been inconsistent with the professed aims of the statutory framers. Such preference would have diluted the benefits conferred on those ex-servicemen who had made full-scale sacrifices; and it would have been inequitable to the many civilians who also had participated voluntarily in essential war and defense activities but who had not been directly connected with a branch of the armed forces.

It is true that § 2 of the Act establishes preference eligibility for the unmarried widows of deceased ex-servicemen despite the fact that these widows may have continued their normal civilian employment during the war. But the preference rights thereby granted are derivative in nature. They are conferred on the widows because of the dislocation and severance from civil life which their deceased husbands suffered while performing full-time military duties and in partial substitution for the loss in family earning power occasioned by their husbands' deaths. Congress felt that this was one way of expressing the moral obligation and the debt of gratitude which this nation was thought to owe these widows. Such a provision certainly affords no basis for widening the concept of

"ex-servicemen" beyond that which we have indicated. The widows of ex-servicemen are in a special category which cannot be compared, in terms of sacrifice or need for reemployment and rehabilitation, with any group of individuals who performed part-time military duties.[14]

In the light of the very clear purpose which Congress had in mind in adopting the Veterans' Preference Act, we are constrained to define the term "ex-servicemen," for the purposes of this particular statute, as relating only to those who performed military service on full-time active duty with military pay and allowances, thereby dislocating the fabric of their normal economic and social life.[15] It thus becomes obvious that respondents' service

---

[14] The same observations apply to the provision in § 2 giving veterans' preference to the wives of ex-servicemen who have a service-connected disability and who themselves have been unable to qualify for any civil-service appointment. See also 62 Stat. 3, extending veterans' preference benefits to the widowed mothers of deceased or permanently and totally disabled ex-servicemen. H. R. Rep. No. 697, 80th Cong., 1st Sess.; S. Rep. No. 480, 80th Cong., 1st Sess.

[15] The view we take of this matter coincides with that expressed by the supporters of H. R. 1389, 80th Cong., 1st Sess. That bill, as amended, proposed to change § 2 of the Veterans' Preference Act by providing that " 'active duty' in any branch of the armed forces of the United States shall mean active full-time duty with military pay and allowances in any branch of the armed forces during any campaign or expedition (for which a campaign badge has been authorized)."

Hearings were held before the House Committee on Post Office and Civil Service. The bill was unanimously reported out by the committee, H. R. Rep. No. 465, 80th Cong., 1st Sess., and was adopted by voice vote by the House of Representatives, 93 Cong. Rec. 7315–7318. A unanimous Senate Committee on Civil Service also reported the bill favorably, S. Rep. No. 396, 80th Cong., 1st Sess., but the Senate adjourned without considering the bill.

The proponents of the bill and the two committees considered it as a clarification of the original Congressional intent as to the meaning of "ex-servicemen." It was stated that the country owes a debt of gratitude to the temporary Coast Guard Reservists, "but they are

with the Volunteer Port Security Force of the Coast Guard Reserve cannot qualify them as "ex-servicemen" entitled to veterans' preference under this enactment. They continued their normal civilian employment with the War Department and the Navy Department during the war, employment which suffered as little as possible from their military service; they served on active duty for only relatively short periods each week and could be disenrolled at their own request; they received no military pay and very few allowances; they could not be transferred away from their homes without their consent. They were therefore able to retain the essential elements of their civilian life. As to them, there was no problem of re-employment or rehabilitation caused by their military service. They are not among the "ex-servicemen" whom Congress desired to assist by means of the Veterans' Preference Act.

One other matter remains. Respondents claim, and the Court of Appeals held, that they acquired vested preference rights under § 18 of the Act. In pertinent part, § 18 provides that "this Act shall not be construed to take away from any preference eligible any rights heretofore granted to, or possessed by, him under any existing law, Executive order, civil-service rule or regulation, of any department of the Government or officer thereof." It is said that the Civil Service Commission's ruling of April 4, 1944, extending preference rights under the then existing laws to those who had performed service with the

---

not to be classed as ex-servicemen, who were actually uprooted from their civilian occupations and subjected to the rigors of full-time military training and combat. It is to the latter group that Congress intended to provide employment preference in Government service." 93 Cong. Rec. 7315. The need for clarification of § 2 was said to be the confusion created by the lower court decisions in the instant cases.

Volunteer Port Security Force, gave respondents vested rights which were preserved by § 18 when the Veterans' Preference Act was subsequently enacted.

This contention is without substance. Veterans' preference rights by their very nature do not accrue until one has become a veteran through separation from the armed forces. On June 27, 1944, when the Veterans' Preference Act became law, neither of the respondents had as yet disenrolled from the Volunteer Port Security Force. In fact, respondent Hubickey had not even enrolled by that date. Thus they could not be classed as veterans or ex-servicemen, whatever definition be given those terms, on June 27, 1944, and they could not have earned any veterans' preference rights prior to that date. The Commission's ruling of April 4, 1944, did no more than inform respondents that they would be entitled to veterans' preference upon disenrollment, provided such ruling was lawful and still in effect. It did not purport to give them preference rights as of April 4, 1944, or to cause those rights to accrue before disenrollment. Since they did not possess and had not been granted any such rights under prior law, respondents were completely unaffected by the provisions of § 18. That section was primarily designed to perpetuate preferences granted earlier to veterans who had served in the armed forces during peacetime and who were then in government employment or on civil-service registers.[16] Respondents were obviously not veterans of that type.

*Reversed.*

Mr. Justice Douglas dissents.

---

[16] See S. Rep. No. 907, 78th Cong., 2d Sess., p. 2; H. R. Rep. No. 1289, 78th Cong., 2d Sess., p. 3. The Veterans' Preference Act does not grant benefits to future peacetime veterans.