Joyce A.H. KEYES, Plaintiff, Appellant,

v.

SECRETARY OF THE NAVY, et al., Defendants, Appellees.

No. 87–1707.

United States Court of Appeals, First Circuit.

Heard Feb. 4, 1988.

Decided Aug. 10, 1988.

Alan Banov, Washington, D.C., for plaintiff, appellant.

Fidel A. Sevillano Del Rio, Asst. U.S. Atty., with whom Daniel F. Lopez–Romo, U.S. Atty., Hato Rey, P.R., was on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, SELYA, Circuit Judge, and CAFFREY,* Senior District Judge.

SELYA, Circuit Judge.

Plaintiff-appellant Joyce A.H. Keyes, a black woman, sued the United States Navy (Navy),[1] and later joined the federal Office of Personnel Management (OPM). In her amended complaint, Keyes alleged that defendants-appellees (1) "discriminated against plaintiff because of her sex and/or her race" by failing to hire her for a vacant position as the supervisory social service analyst (SSSA) at the U.S. Naval Station, Roosevelt Roads, Ceiba, Puerto Rico; and (2) impermissibly awarded "veterans' preference points" to the successful aspirant, Lieutenant James Atkins, allowing Atkins to overtake Keyes in the race for the job. The parties stipulated to the facts and submitted the controversy to the United States District Court for the District of Puerto Rico as a case stated for decision under Fed.R.Civ.P. 52(a). The district court, in a thoughtful and well-reasoned opinion, rejected all of plaintiff's claims. *Keyes v. Lehman*, Civ. No. 84–3163 (D.P.R. May 18, 1987). We affirm.

## I. CHRONOLOGY OF EVENTS

After receiving budgetary approval to fill the SSSA position at Roosevelt Roads, the Navy advertised the vacancy. In mid-January of 1984, OPM received a request to certify a list of "eligibles" for the opening.[2] OPM proceeded to make a position announcement on February 1, with a closing date of February 10. The announcement and notice of vacancy itemized the specialized experience required to qualify for the SSSA berth and noted that the successful applicant would, among other things, be required to provide technical expertise in planning, implementing, operating, and evaluating the family services program at the naval base through supervision of the administrative, counseling, and program coordinating services divisions. OPM's Handbook X–118 set forth a list of some seven factors "to be applied in measuring the applicant's experience in terms of difficulty, importance and scope of duties performed."

Plaintiff, the holder of a doctoral degree in special education, applied for the position, as did Lt. Atkins, a white male who was then on active military duty. Atkins possessed a master's degree in education administration and had extensive experience in human resources management (including a successful tour as director of the Counseling Center at Roosevelt Roads). Personnel specialists within the OPM reviewed the applications, gauged relevant experience and the like, and assigned appraisal scores of 86 points (out of a possible

---

* Of the District of Massachusetts, sitting by designation.

1. The Navy was sued in the person of its Secretary, John F. Lehman, Jr. The Secretary's successors have become parties, *seriatim,* by operation of law. *See* Fed.R.Civ.P. 25(d); Fed.R.App. P. 43(c)(1). Thus, the torch of office has been passed from Lehman to James H. Webb, Jr., and in turn, to William L. Ball III, the incumbent.

2. OPM's procedures, though noted in this chronology, are described in greater depth in Parts III and IV, *infra.* Unless otherwise specified, all of the dated events occurred in calendar year 1984.

100) to each of the two aspirants. OPM then boosted Atkins into the lead by granting him, tentatively, five veterans' preference points (VPPs).[3] On February 28, OPM forwarded a roster of eligibles to the Navy. Keyes was on the list (ranked second, behind one Jean Johnson) but Atkins was not. On March 5, William Wright, director of the Civilian Personnel Office at the base and himself a black male, called OPM to inquire about this omission. After learning that Atkins's name had been dropped because his military commitment lasted until May, Wright asked whether Atkins might be considered if the appointment was deferred. Upon receiving an affirmative assurance, Wright returned the roster with a cover letter stating that recruitment for the SSSA position would probably not occur before May, at the earliest. The entry date was thereafter extended to August 5, 1984.

Wright's maneuver, it seems, kept Atkins in the running. When OPM was requested to forward a "new" eligibles list, and complied, it contained both names (among others). By reason of the VPPs, Atkins—with an appraisal score of 91—headed the list. Keyes, with a score of 86, was tied for third. In early May, Atkins, Keyes, and three others were interviewed by a naval selection board, which unanimously gave Keyes top billing. Seemingly because of her interview performance, the Navy initially chose plaintiff for the position (notwithstanding that Atkins, bedecked with VPPs, outranked her on the certified list). Lacking authority unilaterally to leapfrog a preference eligible individual, *see infra*, the Navy asked OPM for leave to "pass over" Atkins. OPM rejected the request. It found Atkins to be a preference eligible qualified for the post, entitled to it, and therefore, safe from a pass-over initiative.[4] The Navy yielded. Lt.

Atkins was formally selected on July 19, honorably discharged on August 1, and became the SSSA on August 5. He has been performing the duties of the position satisfactorily since that date.

After exhausting her administrative remedies, plaintiff—who since mid–1983 has been continuously employed by the Navy as a teacher and/or school administrator—prosecuted this suit.

## II. STANDARD OF REVIEW

■ Our standard of review on this appeal is familiar:

Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

Fed.R.Civ.P. 52(a). A district court's finding concerning intent in an employment discrimination action is a factual finding within the "clearly erroneous" rubric. *Anderson v. City of Bessemer City*, 470 U.S. 564, 566, 105 S.Ct. 1504, 1507, 84 L.Ed.2d 518 (1985); *Hallquist v. Local 276, Plumbers and Pipefitters Union*, 843 F.2d 18, 22 (1st Cir.1988). And although this matter was decided on a paper record, without live testimony, "the clearly erroneous standard governs ... in full flower." *In re Tully*, 818 F.2d 106, 109 (1st Cir.1987), citing *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511.

■ Where a district court sits without a jury, as here, our proper function is far removed from any attempt to decide factual issues anew. *Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511. We are not at liberty to prepare a palimpsest. Rather:

If the district court's account of the evidence is plausible in light of the record

---

3. As a matter of standard administrative procedure, OPM calculates VPPs preliminarily, and the selecting agency, here the Navy, later verifies OPM's computation. This must be done before the person's entry on duty so that the agency can certify that the applicant met applicable requirements and deserved the preference. In this case, the Navy verified Atkins's entitlement to the points by early August.

4. OPM, when asked to allow the Navy to pass over Atkins, essayed no further head-to-head comparison of the two aspirants. Instead, it measured Atkins's qualifications against the requirements of the position, and found them to pass muster. This was the proper protocol. *See* Federal Personnel Manual, ch. 311, sub. 4–9(b) (May 7, 1981) (quoted *infra* Part IV).

reviewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Id.* at 573–74, 105 S.Ct. at 1511. It follows logically that: "Where the conclusions of the [trier] depend on its election among conflicting facts or its choice of which competing inferences to draw from undisputed basic facts, appellate courts should defer to such fact-intensive findings, absent clear error." *Irons v. FBI,* 811 F.2d 681, 684 (1st Cir.1987); *see also Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511; *Gierbolini–Colon v. Aponte–Roque,* 848 F.2d 331, 334–35 (1st Cir.1988).

With these guidelines in mind, we turn first to Atkins's professed entitlement to the assigned VPPs. Finding the award of points to have been appropriate in this case, we proceed to scrutinize the district court's conclusion that plaintiff proved no purposeful race or sex discrimination on defendants' part.[5]

## III. VETERANS' PREFERENCES

To place the tabulation of VPPs into proper perspective, we must first discuss the federal civil service, the role that veterans' preferences play in the scheme of things, and how OPM fits into the picture. When this backdrop is painted—albeit with a rather broad brush—we will address Atkins's entitlement to a preference.

A. *The Competitive Service.* In the executive branch, "open, competitive examinations," 5 U.S.C. § 3304, are generally a precursor to appointment to "competitive" positions within the federal civil service. *See generally* 5 U.S.C. §§ 3301–3328. The SSSA vacancy fell within this taxonomy. Thus, interested parties were required to compete and undergo examinations so that

OPM—which administers the service—might establish a "register[ ] of eligibles." 5 U.S.C. § 3313. In ranking eligibles, OPM does so by aggregate point scores, including allowable preferences and credits for experience. 5 U.S.C. § 3311.

Once the register is constituted, OPM "shall certify enough names from the top of the ... register to permit [the] ... appointing authority ... to consider at least three names for appointment to each vacancy in the competitive service." 5 U.S.C. § 3317(a). If a "preference eligible" is on the list, he or she cannot be "pass[ed] over" by the appointing authority in favor of a lower-ranked individual unless OPM, for good cause shown, acquiesces. 5 U.S.C. § 3318(b)(1).

B. *Veterans' Preferences.* A veteran, that is, a person who "served on active duty ... at any time in the armed forces for a period of more than 180 consecutive days [within a specified time period] ... and who has been separated ... under honorable conditions," 5 U.S.C. § 2108(1)(B), is a "preference eligible." *See also* Federal Personnel Manual (FPM), ch. 211, sub. 2–1 (July 7, 1983) (defining "veteran" as one "who was separated [honorably] from active duty in the armed forces"). As such, the veteran is entitled to receive an additional five points above his or her earned score for purposes of register consideration. *See* 5 U.S.C. §§ 2108(3)(A), 3309(2).

Veterans' preferences may seem counterintuitive in an era and in a nation where equality of opportunity has, happily, become the order of the day. But such preferences—themselves rooted in the proud legacy of our patriotism—endure. Indeed, Title VII expressly sanctions their use. *See* 42 U.S.C. § 2000e–11. And the Supreme Court, while acknowledging "[t]he substantial edge granted to veterans by [such statutory preferences]," *Personnel*

---

5. Because of the view we take of this case, we need not consider whether—and if so, to what extent—an affiliated party (like OPM) can be considered sufficiently tied to the employer of record (here, the Navy) to be liable under Title VII for discriminatory hiring practices. *Cf. Mas*

*Marques v. Digital Equipment Corp.,* 637 F.2d 24, 26–27 (1st Cir.1980) (discussing liability of parent corporation for discriminatory acts of subsidiary). We do not purport to address such questions today.

*Administrator v. Feeney,* 442 U.S. 256, 281, 99 S.Ct. 2282, 2297, 60 L.Ed.2d 870 (1979), has held their enactment and implementation not to constitute impermissible gender-based discrimination. *Id.* This is but one more instance where "[t]he legislative branch has made its policy choices and the courts must honor them." *Irons v. FBI,* 811 F.2d at 689.

C. *OPM's Role.* We are cognizant that OPM's particular province is to issue, through the FPM, "personnel instructions, operational guidance, policy statements, related material on government wide personnel programs, and advice on good practice in personnel management to other agencies." FPM, ch. 171, sub. 2–1 (June 10, 1986). It is also the agency's responsibility to "establish and administer a(n) ... appointment system for positions subject to competitive examinations which will permit adjustment of the career service to necessary fluctuations in Federal employment, and provide an equitable and orderly system for stabilizing the Federal work force." 5 C.F.R. § 2.2 (1987). The FPM describes the OPM's role succinctly:

> As the Government's central personnel agency, the OPM has primary responsibility for the maintenance of an effective Federal work force and the operation of the merit system. The OPM meets its responsibility by: (1) planning, coordinating, directing, and seeking to improve the Government-wide recruitment function.

FPM, ch. 332, sub. 1–3(b)(1) (May 7, 1981). ■ Because it has the principal responsibility for administering the competitive service, OPM's interpretation of the statutes, regulations, and guidelines is entitled to deference. *E.g., Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 759–60, 93 L.Ed.2d 757 (1987); *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Massachusetts Dep't of Education v. United States Dep't of Education,* 837 F.2d 536, 541 (1st Cir.1988). As the Court has taught, "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer...." *Chevron U.S.*

*A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

In this instance, OPM considered Atkins to be a veteran within the statutory/regulatory mosaic and, therefore, awarded him five VPPs. It was this trouvaille which vaulted Atkins ahead of Keyes on the register and which, under 5 U.S.C. § 3318(b)(1), required the Navy to offer him the position unless OPM agreed to a passover.

D. *Atkins's Entitlement.* Appellant correctly notes that both the statute and the FPM use the past tense in defining the term "veteran." *See* 5 U.S.C. § 2108(1)(B) ("veteran" is one who *"has been separated"*) (emphasis supplied); FPM, ch. 211, sub. 2–1, *supra* ("veteran" is one who *"was separated"*) (emphasis supplied). Based on this linguistic adaptation, Keyes argues that it was inappropriate—and wrong—for OPM to allow Atkins, while he was still on active duty, to receive the statutory preference. We briefly rehearse the course of events.

■ The FPM explicitly permits an individual to apply for civil service positions "while he/she is still in the armed forces, provided he/she is about to be discharged or released from active service." FPM, ch. 332, sub. 3–2(c)(2) (May 7, 1981). Initially, however, OPM excluded Atkins from the February 28 list of eligibles, having determined that he was unincludable because his separation from military service was not imminent, *i.e.,* he would not be available for civilian work until May at the earliest and, therefore, was not "about to be" discharged. When the Navy deferred the appointment, *see supra* at 1019, OPM reversed its field. Given the revised date of hire, Atkins's availability loomed as sufficiently imminent. Thus, his active duty status was no barrier. We find these determinations to be both reasonable and consistent with law.

As to imminency, the point is self-elucidating: Atkins was separated from active military service by the end of July (and could, the record suggests, have been separated a bit earlier, if he wished). This was

sufficiently proximate, given the overall time frame, to be "imminent" by any rational standard. As to his active duty status, we acknowledge—as did the district court—that those portions of the FPM made available to us do not explicitly cover the award of tentative VPPs to applicants who remain in the armed forces while under consideration for civil service positions. The FPM does, however, embrace the subject by fair implication. For example, it provides:

> The circumstances of the individual case dictate whether veterans' preference is awarded ... in competitive appointments. The types of circumstances follow: (1) Examining officers must determine the military rank of applicants *who at the time of application are still in the armed forces* before assigning competitive ratings. When it is clear from a review of the application that the applicant will retire at or above the rank of major or lieutenant commander, tentative veterans' preference will not be awarded.

FPM, ch. 332, sub. 3–5(b)(1) (Apr. 27, 1983) (emphasis supplied). It is entirely reasonable, we think, to infer from this passage that VPPs may tentatively be assigned to persons who will retire *below* the rank of major/lieutenant commander (notwithstanding currency of service). Atkins, of course, was such a one. Another FPM provision, which stipulates that eligibility must be suspended when an applicant "is on active duty and, therefore, cannot accept appointment," FPM, ch. 332, sub. 3–3(b)(3) (May 7, 1981), allows for restoration of eligibility upon honorable discharge, along with "any additional points to which he/she may be entitled for veterans' preference." *Id.* It seems logical that this provision was created in order to grant veterans' preferences to service members discharged after OPM has closed its books and prepared its certificate of eligibles, but before the available position was filled.

In this situation, we hark back to the deference due the agency. OPM's interpretation of the governing statutes and regulations represents a "sufficiently rational [choice] to preclude a court from substituting its judgment for that of the [agency]." *Sprandel v. Secretary of HHS*, 838 F.2d 23, 25 (1st Cir.1988) (per curiam), quoting *Young v. Community Nutrition Institute*, 476 U.S. 974, 106 S.Ct. 2360, 2365, 90 L.Ed.2d 959 (1986). The award of VPPs, on a tentative basis, to those servicemen and servicewomen who are close to the end of their military careers does no violence to the statutory language. Meanwhile, such a course enhances the policy which Congress has followed since first passage of the Veteran's Preference Act in 1944: "favor(ing) those who ha[ve] a real record of military service." *C.I.R. v. Connelly*, 338 U.S. 258, 260, 70 S.Ct. 19, 20, 94 L.Ed. 51 (1949). *See also Mitchell v. Cohen*, 333 U.S. 411, 418–20 & nn. 12–13, 68 S.Ct. 518, 522–23 & nn. 12–13, 92 L.Ed. 774 (1948) (discussing legislative history). The extension of veterans' preference eligibility to one hovering on the brink of honorable discharge is, we believe, a reasonable application of this principle. A contrary interpretation would require a member of the armed forces to return—presumably jobless—to civilian life before he or she could claim the preference eligible status which the legislative branch has ordained should be an incident of military service. Such a tight-fisted rule would make the veteran's lot more difficult without providing any corresponding systemic benefit. We do not believe Congress intended such an artificial stratification.

Appellant has conceded that, apart from the timing of the award, there was no basis for disallowing Atkins's claim of entitlement to preference eligible status. Similarly, the number of points awarded is not in issue. *See* 5 U.S.C. §§ 2108(3)(A), 3309(2). That being so, and because we find OPM's construction of the regulations consistent with the statutory plan and persuasive, under the totality of the attendant circumstances, we defer to the agency's judgment. Veterans' preference was properly assigned to Atkins in this instance.

## IV. DISCRIMINATION

The fact that OPM was within its rights in awarding VPPs to Atkins is not, however, dispositive of Keyes's claims. She

contends that—VPPs or no—the selection process was rigged to discriminate against her and in favor of her rival, and that race and sex underlay what transpired.

■ In a disparate treatment case such as this, the judicial inquiry focuses inevitably on plaintiff's complaint that she was treated unfairly—less favorably than others, similarly situated, were or would have been—because of some safeguarded attribute, say, race or gender. *See, e.g., Furnco Const. Co. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 106–07 (1st Cir.1988). Absent direct proof of discrimination—and none appears in this record—plaintiff's case had to be proven under the *McDonnell Douglas* model. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981); *Oliver*, 846 F.2d at 107. When adapted to the present case, the model required plaintiff to show that: (i) she was a member of a protected class; (ii) she was qualified for the SSSA position; (iii) she was not hired despite her qualifications; and (iv) the job was given to a person outside the protected group. This hurdle, we think, was vaulted: Dr. Keyes is both a woman and a black, Lt. Atkins is neither, and despite Keyes's obvious qualifications, she was not hired. Atkins was.

■ Once plaintiff succeeded in establishing her prima facie case, the burden shifted to defendants to produce evidence that Dr. Keyes lost out for some nondiscriminatory reason. *Burdine*, 450 U.S. at 254–55, 101 S.Ct. at 1094–95; *Oliver*, at 107. Defendants need not persuade the court that they were actually motivated by the proffered reason. It is sufficient if their evidence raises a genuine issue of fact as to whether they purposefully discriminated against the plaintiff. In other words, the explanation provided must be legally sufficient to justify a judgment in their favor. This burden of production was unarguably met: there was evidence that Atkins had satisfactory credentials and that he and Keyes, at the end of OPM's screening, rated equal appraisal scores. There was also evidence that Atkins was entitled to the VPPs which put him over the top. Then, too, there was proof that the Navy wished to bring plaintiff on board but could not do so because Atkins outranked Keyes on the register of eligibles and OPM would not allow leap-frogging. Finally, there was evidence as to OPM's basis for vetoing the bypass, an action which it claimed, plausibly, was rooted in Atkins's qualifications. *See supra* note 4.

This articulation of legitimate, nondiscriminatory reasons for hiring Atkins in lieu of Keyes sufficed to erase the presumption raised by plaintiff's prima facie case. *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094. At that point, it was the plaintiff's burden, unaided by the original presumption, to show that the defendants' reasons were pretexts for discrimination. *Id.* at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. It is here that the district court found appellant to have stumbled. On this record, we cannot say the court was clearly wrong.

■ We start with the premise that Atkins's score of 86 points in the examination process—identical to Keyes's score—doubtless entitled him to inclusion on the register of eligibles. *See* FPM, ch. 332, sub. 4–1(a) (Feb. 26, 1982) (persons "who have earned a rating of 70 or more and meet the other examination requirements are entered" on register of eligibles). To be sure, Keyes questioned these ratings. The evidence before the district court, however, indicated that OPM's screening was done on the basis of the candidates' applications and curricula vitae in accordance with the rating guides established in Handbook X–118.[6] The rating guide promulgated a series of components related to the duties of the SSSA position. OPM then distilled the particular qualifications for the job into

---

6. Appellant has not claimed, either below or on appeal, that the rating guide and/or position description had a disparate impact on persons of her color or sex.

"essential elements" (EEs) and "desirable elements" (DEs). The EEs accounted for the major part of the appraisal score. The grading was essentially "pass/fail"—if an aspirant possessed all the required EEs, he or she was awarded seventy points. Conversely, an aspirant who lacked any EE was immediately disqualified.

Both Keyes and Atkins were deemed to possess all of the EEs, and each received seventy points on this account. Though the record is murky as to the exact ingredients of these EEs, Keyes cannot complain about this facet of the process for three reasons: (1) she herself received the maximum number of EE points, (2) she has never contended that Atkins lacked an EE, and (3) she has failed to illuminate (either for the district court or for us) any errors of inclusion or exclusion in OPM's discernment of which elements were "essential" to the proper performance of the position.

There were four DEs to be considered. The appellate record does not reflect the exact nature of this quartet of elements. Be that as it may, each counted for five points. Keyes was found to possess two of the four—and was awarded ten points (the maximum) on this basis. Once again, she is in a perilously poor position to complain: she has not made any claim that she possessed either of the other two DEs, nor has she offered any evidence that OPM's formulation was biased. By the same token, she has not argued that Atkins was improperly credited with DE points.[7]

The last segment of the appraisal scores comprised the award of bonus points for excess specialized education or experience. Keyes was awarded six points in this category, because OPM counted her educational attainment—she had earned a Ph.D.— "for the equivalent of 3 years of excess specialized experience/education." Record Appendix at 71. Atkins was also awarded six points—four points because his master's degree was deemed equivalent to two years of excess specialized experience/education, and two points because of work history unique to him, and not approximated in Keyes's application. In this respect, we have compared the lives and letters of the two individuals. Keyes's work history was largely education-related. The SSSA position, however, was wider in its perspective. The OPM determined that Atkins possessed this breadth of experience to a great degree, and awarded him two bonus points. *See id.* at 72. If finding the facts afresh, we might have weighed the protagonists' credentials differently—but we cannot characterize OPM's assessment as arbitrary or unfounded. This is particularly so because the item which seems to have sparked the greatest interest—Atkins's service as a human relations officer at Whiting Field—was work of a genre strikingly similar to that posited for an SSSA.[8] Finally, we note that Keyes has neither adverted to any specific "specialized experience" on her part which necessarily matched Atkins's accomplishments, nor has she made the slightest effort to convince us that the decision to award her rival points for his unique background was unreasonable.

It is, perhaps, arguable that OPM should have counted plaintiff's terminal degree more heavily, or should have assayed specialized experience somewhat differently. Yet Keyes has failed to show that OPM, in compiling these appraisal scores, deviated one iota from its rating guides or its accustomed practices. It is chancy business, indeed, for a court—on so interstitial a mat-

---

7. Atkins, like Keyes, received maximum credit—five points apiece—for possessing the first and third DEs, and received no credit for the second or fourth DEs.

8. As a human relations officer at Whiting Field for some sixteen months, Atkins:

> Instructed squadron personnel in Human Resources Management programs. Designed and implemented an orientation school for dependent spouses of squadron personnel. Organized and monitored community rela-

tions programs. Assisted chain of command in helping personnel with extensive personal problems. Compiled agenda and took minutes of Executive Officer's meetings with Human Relations Department. Investigated disputes between Navy and civilian personnel. Instructed race relations seminars. Was Command Drug Exemption Counselor and Drug and Alcohol Education Instructor.

Record Appendix at 15.

ter—to set itself up as a super personnel-evaluator and attempt to reweigh the credentials of the candidates. The district judge found that, in being given identical scores of 86, "Atkins and Keyes were similarly treated." *Keyes v. Lehman, supra,* slip op. at 8. Based on our review of the applications and other materials,[9] this finding enjoys record support. Although a contrary conclusion may also have been possible, there is no principled way we can strike the finding as clearly erroneous.

▪ Keyes lays great stress on her highly favorable evaluation by the naval selection board, but to no avail. The interviews, which were conducted after the appraisal scores had been compiled and the certificate of eligibles completed and forwarded by OPM, were not part of the OPM protocol. Under the regulations, OPM had no right to redo the certificate based on the interview results. The Navy, on the other hand, did all that it legitimately could with them, beseeching a passover. It is surpassingly difficult to see how a claim of discrimination can be premised on these facts.

▪ Appellant has an equally tough row to hoe in terms of the response to the passover request. From aught that appears, OPM acted in line with its own regulations and within its proper domain when it denied the Navy's entreaty. *See* FPM, ch. 332, sub. 4–3(c)(2) (Feb. 26, 1982) (appointing body "may not pass over a preference eligible and select a nonpreference eligible unless [it] submits reasons which OPM finds are sufficient to warrant the passover"). Keyes argues, of course, that the Navy's reasons were adequate and that the passover should have been authorized —yet that argument merely restates her thematic refrain that she was better qualified than Atkins. The qualifications of the two *relative to each other,* however, were immaterial vis-a-vis the passover. *See*

FPM, ch. 311, sub. 4–9(b) (May 7, 1981) (for passover purposes, "OPM will not accept as sufficient a showing that the nonpreference eligible tentatively selected is superior to the preference eligible"). If a favorable head-to-head comparison was all that was needed to obtain a passover, then the veterans' preference would be no preference at all, and the "substantial edge" envisioned by Congress, *Feeney,* 442 U.S. at 281, 99 S.Ct. at 2297, would be but an illusion.

As to Atkins's suitability, OPM noted his possession of all of the EEs and two of the DEs, *see supra,* his master's degree, his specialized experience, and then, in the course of elucidating its rationale for grading Atkins favorably, OPM cited "his performance appraisals, all of which rate him outstanding in managerial abilities, leadership and quality of ... work." Record Appendix at 28. In the agency's judgment, these recommendations, combined with Atkins's work history, tended "to demonstrate that he has the ability to organize and direct a program of the scope of the Family Services Center in Roosevelt Roads." *Id.* There is adequate evidence in the record to support these conclusions.

In the last analysis, the Navy—pro-Keyes or not—was powerless in the face of OPM's declination to allow a bypass. *See* 5 U.S.C. § 3318(b)(1) (after OPM "has completed its review of the proposed passover, it shall send its findings to the appointing authority and to the preference eligible. The appointing authority *shall comply* with the findings of the [OPM]") (emphasis supplied). The passover protocol embodies an absence of discretion on the part of the employer which militates strongly in favor of a corresponding absence of purposeful discrimination.

To the extent that Keyes's assault focuses on Atkins's (lack of) credentials in the abstract, she does not make the case so convincingly that an appellate court can

---

9. Plaintiff makes much of the fact that Atkins's original application, upon which OPM's appraisal was based in part, could not be located at the time of trial. Yet the defendants did produce an application from Atkins dated June 15, 1984 (before the award of the position was made), and there is enough room in the record to

conclude that the original application was substantially identical to the one produced at trial. In any event, OPM's original register cards—on which the certification decision was actually based—were available. *See* Record Appendix at 66 n. 2.

appropriately intervene. The facts that she brings to our attention are perhaps sufficient to support the inference for which she argues, but they surely do not *compel* that inference to be drawn. The record contains substantial evidence, we think, to support OPM's conclusion that Atkins was suitably qualified to serve as the SSSA. *A fortiori*, the district judge's acceptance of the conclusion should not be upset.

We sum up briefly. The theme of plaintiff's case is the claim that her qualifications for the SSSA position were infinitely superior to those possessed by Atkins. That may well be so—yet the comparison is not legally required, and the results are, at best, legally inconclusive. Neither the defendants' managerial judgment nor their recruiting acumen is on trial in this case. Like any other employer, the Navy was at liberty to err in filling a post, and OPM was equally at liberty to err in compiling rankings or denying a passover request.[10] Errors in judgment are not the stuff of Title VII transgressions—so long as the "mistakes" are not a coverup for invidious discrimination. *See Gray v. New England Telephone and Telegraph Co.*, 792 F.2d 251, 255 (1st Cir.1986) ("It is not enough for the plaintiff to show that the employer made an unwise business decision, or an unnecessary personnel move.... [or] that the employer acted arbitrarily or with ill will."); *see also Dea v. Look*, 810 F.2d 12, 15–16 (1st Cir.1987); *White v. Vathally*, 732 F.2d 1037, 1042 (1st Cir.), *cert. denied*, 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 267 (1984); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n. 6 (1st Cir.1979). Title VII does not presume to obliterate all manner of inequity, or to stanch, once and for all, what a Scottish poet two centuries ago termed "[m]an's inhumanity to man."[11] What counts for purposes of a suit such as this is whether or not some specially protected quality—say, race or gender—has been implicated. For Title VII purposes, as the Seventh Circuit recently observed:

> An employer can fire an employee for any reason, fair or unfair, so long as the decision to terminate is not based on age or some other protected category.

*Kier v. Commercial Union Ins. Cos.*, 808 F.2d 1254, 1259 (7th Cir.) (footnote omitted), *cert. denied*, —— U.S. ——, 107 S.Ct. 1955, 95 L.Ed.2d 528 (1987). Put another way, it was plaintiff's burden not only to show that the defendants' proffered reasons for hiring someone else were apocryphal, but that those reasons were pretexts *aimed at masking sex or race discrimination*. The distinction is a crucial one in order "to insure that [Title VII] does not become a cloak which is nonchalantly spread across the record" in every instance where one employee (or prospective employee) loses out to a rival of contrary race or gender. *Hosemann v. Technical Materials, Inc.*, 554 F.Supp. 659, 667 (D.R.I. 1982).

We need not harp on this point. Concededly, there was evidence in this case on which a finding of apparent favoritism toward Atkins could have been predicated: the selection was delayed to allow him to be considered in the first place, Wright seemingly intervened on his behalf, Atkins lacked plaintiff's terminal degree but was rated—veterans' preference aside—as Keyes's equal, and her interview scores were higher.[12] There was also evidence that Keyes was not treated in a forthcoming manner when she sought administrative review of what had transpired. But there was more than chopped liver in the other pan of the scales—evidence that Atkins himself was no slouch, that OPM handled the affair in a routine fashion, that the naval selection board was on an even keel,

---

**10.** We do not imply that Keyes was or was not better fitted for the SSSA position, or that errors were or were not made by either the Navy or OPM. As we explain in the text, this litigation does not turn on the answers to such questions.

**11.** R. Burns, *Man Was Made To Mourn* (1786).

**12.** This evidence, of course, cuts both ways. Evaluating an applicant at an interview is a highly subjective exercise. If, as plaintiff contends, the Navy was seeking to stack the deck against her and in favor of Atkins, one might reasonably expect to find the interview scores manipulated to achieve that end. They were not.

and that the Navy tried to give the SSSA position to Keyes. Plaintiff, who had the ultimate burden of proving the claim, did not offer a scintilla of evidence which tended to show that her color or her sex—as opposed, say, to some informal preferment of veterans or garden-variety cronyism—was a factor in the decisionmaking process. On this record, we cannot state that the district court erred in finding the selection of Atkins over Keyes to be free from the taint of racial or sexual animus.

## V. CONCLUSION

We need go no further. Having correctly ruled that Lt. Atkins was entitled to veterans' preference, the district court found, supportably, that plaintiff's failure to obtain the SSSA position was not the result of purposeful discrimination against persons of her race and/or gender. Whether or not we, if writing on a clean slate, would have reached the same conclusion, we cannot presume to say that the lower court, in declining to find that discriminatory intent animated the selection of a qualified preference eligible for the SSSA post, made a blatant miscalculation. There were various permissible views of the proof—and it was the district judge's prerogative, indeed, his duty, to choose among them.

Because we are left with no "definite and firm conviction that a mistake has been committed," *In re Tully*, 818 F.2d at 109, quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), the judgment below must be

*Affirmed.*